Argued Aug. 7, decided Aug. 13, rehearing denied Oct. 1, 1912.

### McNAIR v. BENSON.

(126 Pac. 20.)

Compromise and Settlement—Execution of Settlement—Evidence —Sufficiency.

1. In an action to set aside a conveyance and to cancel notes procured from plaintiff through duress, by threatening to expose his fraud in real estate transactions with defendants, evidence held to warrant a finding that plaintiff made full settlement for any misrepresentations made by him in such transactions before he was coerced into making the conveyance and the notes.

Compromise and Settlement— Consideration for Compromise — Fraud.

2. Actual malice not being an ingredient of a real estate transaction under which plaintiff defrauded defendants, there was no such basis for recovery by defendants against plaintiff of exemplary damages as to constitute a valid consideration for a

contract of compromise, into which plaintiff was coerced through duress.

**Bills and Notes—Deeds—Execution—Duress—Ratification.**

3. In an action to cancel a conveyance and notes which plaintiff was coerced by defendants into making, under duress, a telegram sent by him to a third party after the duress was exercised, indicating that he had made a satisfactory settlement, did not constitute more than a mere admission, and did not show a ratification of the settlement of the transaction.

**Bills and Notes—Deeds—Execution—Existence of Duress.**

4. A deed and notes made by plaintiff to defendants were invalidated by duress, where, though he was not so confined to an office that he could not have unlocked the door, and though no physical force was employed to restrain him, he was kept for several hours under surveillance, was told that he could not leave the room until he gave the deed and notes, and was threatened with disgrace if he did not comply with defendants' demand.

**Appeal and Error—Review—Equity Cases.**

5. In equity cases on appeal, findings of the trial court are not controlling on the Supreme Court.

**Equity—Clean Hands Maxim—Fraud of Plaintiff.**

6. Where plaintiff purged his fraudulent conduct in real estate transactions with defendants by making a settlement with them, he will not be denied equitable relief on account of such fraud against a deed and notes which they compelled him to execute under duress.

From Multnomah: JOHN P. KAVANAUGH, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit by J. S. McNair against C. G. Benson, B. M. Benson, and E. P. Dosch to set aside a transfer of an interest in real property, to cancel negotiable promissory notes, to enjoin a disposal of such estate and commercial paper, and to recover money. It is alleged in the complaint, in effect, that on January 18, 1911, the defendants, conspiring to defraud the plaintiff, confined him in a room, refused to liberate him, threatened him with criminal charges, and to do all in their power to

injure and disgrace him, unless he paid them large sums of money, and executed to them a transfer of all his interest in 320 acres of land in Polk County, Oregon, known as "Willamette Orchard Tract No. 1"; that, believing such threats would be executed, he paid them $2,000, gave them his five negotiable promissory notes, each for $500, and also transferred to them all his interest in such real property; that the payment, the giving of the notes, and the transfer of the interest were without consideration, and were obtained in consequence of threats, coercion, and fraud; and that, unless restrained, the defendants will dispose of the notes and the interest in the lands to innocent purchasers, to the irreparable damage of the plaintiff, who has no plain, speedy, or adequate remedy at law for the redress of his grievances.

The answer denied the material averments of the complaint and for a further defense alleged, in substance, that the money was paid, the notes were given, and the interest in the real property was transferred in order to compromise and settle a claim for damages which the defendants made against and presented to the plaintiff, which payments, the giving of the notes, and the transfer of the interest in the land were voluntarily made in consideration of the defendants' promise not to prosecute their claim against him in a court of justice.

The reply having put in issue the allegations of new matter in the answer, the cause was tried, resulting in a decree as prayed for in the complaint, and the defendants appeal.                                        Affirmed.

For appellants there was a brief and oral arguments by *Mr. B. M. Benson* and *Mr. Cicero M. Idleman.*

For respondent there was a brief over the names of *Mr. William L. Brewster, Messrs. Flegel & Reynolds* and *Mr. Kingman Brewster,* with an oral argument by *Mr. Kingman Brewster.*

MR. JUSTICE MOORE delivered the opinion of the court.

1. The evidence shows that on April 11, 1910, W. W. Fawk executed to C. C. Murton a writing, in which he stipulated to convey to the latter what was then supposed to be 320 acres of land for $18,500, of which sum $100 was then received.  $3,900 was to be paid when an abstract of the title to the premises was furnished and a deed to the land executed.  $4,500 was to be paid January 1, 1911, and the remainder, $10,000, on or before five years, with interest on the two latter sums at 6 per cent per annum.  A survey of the land having been made, for the purpose of dividing in into orchard tracts, the premises were found to contain 322 acres.  The plaintiff, trying to form a syndicate to pay for the land and to sell and convey the platted tracts, falsely represented to the defendants C. G. Benson and Dosch that, in order to secure a transfer of Murton's interest in the real property, it would be necessary to pay him therefor on the basis of $75 an acre, or $5,650 more than the original purchase price, when Murton had no interest in the premises, except to act as a mere trustee, who was to have received $250 for his services.  The plaintiff, further falsely representing that he and C. C. Page would pay Murton the sum which, it was asserted, was necessary to secure a transfer of his interest in the premises, and that they had already given him on account thereof $4,000, and that each would take an undivided one-fourth interest in the land, induced C. G. Benson and Dosch each to take a like interest, and to pay therefor $2,000 each, from which sum $3,500 was given to Fawk, who, with his wife, executed to the Title & Trust Company, a corporation, a deed to the land.  Murton also, for the expressed consideration of $5,650, claimed to have been paid by J. S. McNair, E. P. Dosch, C. G. Benson, and C. C. Page, executed to the Trust Company a deed of all his interest in the real property . No money whatever was paid to Murton for this conveyance.  The Trust Company issued to McNair,

Dosch, C. G. Benson, and Page trust certificates, showing that each was a beneficial owner of an undivided one-fourth interest in the premises, in the general management and sale of which the corporation was to act as the financial agent.

Of the $4,000 so paid by C. G. Benson and Dosch, $500 thereof was, by Fawk's direction, paid to E. P. Mossmon and S. L. Young on account of commission for negotiating a sale of the land to Murton. When such sale was effected, Mossmon was plaintiff's partner in the real estate business, which firm thereafter continued and existed at the time of the trial herein.

In November, 1910, C. G. Benson and Dosch, having learned that the $4,000 which they gave was the only money actually paid on account of the purchase of the land, and that the plaintiff and Page, without paying any consideration therefor, had each obtained an undivided one-fourth interest in the premises equally with them, complained of such conduct to McNair, who, on December 5th of that year, admitted making the false representations hereinbefore mentioned, and agreed for himself and Page to pay the installment of $4,500 maturing January 1, 1911, and the further sum of $435 as interest thereon.

Pursuant to this understanding, the plaintiff paid to the Trust Company $2,500 for Fawk, and also left with it for him promissory notes for $1,435 and $1,000 respectively; the latter note having been signed by Mossmon as a joint maker. Fawk accepted the money and notes in full settlement of the installment of the purchase price maturing January 1, 1911, and thereupon returned to Mossmon the note for $1,000, marked "Paid," in satisfaction of the remainder of the commission due on account of negotiating a sale of the land to Murton. As a part of this settlement, the plaintiff assigned to the defendant B. M. Benson, an attorney at law, 10 per cent of the profits expected to be realized from a sale of parts of his interest in the orchard tracts, in consideration for

which that member of the bar stipulated to transact for
McNair all his law business pertaining to the manage-
ment and sale of such parcels of land.  Of the money
paid to the Trust Company, pursuant to the agreement
mentioned, $1,500 was obtained from L. and S. Friemen,
to whom McNair, in consideration thereof, transferred
three-fourths of his interest in the premises.

Having learned that Fawk had received for his land
in money, notes, mortgage, etc., only $17,000, instead of
$18,500 as stated in the contract with Murton, and that
he had paid $1,500 as commissions for negotiating the
sale to Young and Mossmon, the latter being McNair's
partner, B. M. Benson, on January 18, 1911, invited the
plaintiff into his office, which he entered about 10 o'clock
a. m. and found the other defendants assembled there.
The door of the room was thereupon fastened by a spring
lock, which did not permit an entry without turning the
catch, but would not prevent an exit if the bolt were
removed from the inside.   McNair was directed to be
seated, and informed that more of his fraud had been
discovered, respecting the receipt of $1,500 from Fawk
as commissions.  He was told that, in order to liquidate
the damages which the defendants had sustained by rea-
son of his misrepresentations, it was necessary that he
should immediately pay them $4,500 and transfer to
them his remaining interest in the land, and that, unless
he complied with their requests, an action would forth-
with be commenced against him for his fraud, to recover
the damages for which a complaint had already been
prepared.  He was further informed that if such action
were instituted it would disgrace him and his family and
ruin his business.  The plaintiff asked permission to con-
sult with a lawyer and also to visit his wife before acced-
ing to their demands; but his requests were denied, and
he was commanded then and there to settle their claim
for damages.  He was permitted to leave the office twice;
but on each occasion was accompanied by one of the

defendants, and on his return he was compelled to sit so that two of them were between him and the door, and he was notified that he could not leave the room until he made the settlement required. At nearly 3 o'clock in the afternoon, in attempting to issue an order on a bank for $2,000, he was so nervous that the paper was destroyed; whereupon he drew another check for the amount, payable to B. M. Benson, who indorsed it to C. G. Benson, and the latter hurried to the bank and secured the money before that institution closed its doors for the evening. A few minutes after 3 o'clock of that day McNair issued to Dosch two negotiable promissory notes for $500 each, and to C. G. Benson three similar notes, each for the same sum, and also transferred to them his remaining interest in the real property.

During their settlements, the plaintiff offered to repay Dosch and C. G. Benson the sum which they had given on account of the purchase of the land and interest thereon; but they declined the proposal. After McNair had transferred three-fourths of his interest in the premises to L. and S. Friemen, B. M. Benson wrote them respecting the land, saying *inter alia*:

"This is a splendid investment nevertheless and an opportunity such as seldom presents itself."

The trial court, referring to January 18, 1911, made a finding of fact as follows:

"That at the said time defendants had no plausible pretense of a cause of action against the plaintiff, and there was no sum of money due from the plaintiff to the defendants, and that the defendants had not been damaged in any sum whatever by reason of any misrepresentations made by plaintiff, and that plaintiff had, on December 5, 1910, made a full, complete reparation for any misrepresentations made by him to defendants, and plaintiff had not deceived defendants in any particular after said settlement of December 5, 1910."

Dosch and C. G Benson having paid on account of the purchase of the land $4,000, McNair gave in money and

notes for the same purpose $4,935.  It will be remembered that one of these notes for $1,000 was returned by Fawk to Mossmon as paid.  If it be assumed that this credit inured to plaintiff, he nevertheless paid for Page and himself $3,935, or $65 less than Dosch and C. G. Benson.  We think the evidence clearly shows that the $1,500 given in money and by return of the note to Young and Mossmon as commissions were payments in which the plaintiff had no interest, and of which he received no part.  McNair stated upon oath that, though Mossmon was his partner, there was a special agreement consummated by them respecting the Fawk transaction, whereby Young shared with Mossmon the entire commission, in consideration for which the latter relinquished his right to share in any of the profits expected to be derived by McNair from a sale of the orchard tracts.  The plaintiff's testimony in this respect is corroborated by that of Mossmon, and the statement is not disputed by any other witness.  It may therefore be conceded as an established fact that, pursuant to the settlement of December 5, 1910, the plaintiff paid for himself and Page on account of the purchase of the land $4,935, or $935 more than Dosch and C. G. Benson.  We concur with that part of the finding, hereinbefore quoted, that the defendants had not been damaged in any sum whatever by reason of any misrepresentations made by plaintiff; that on December 5, 1910, he made a full and complete reparation for any misrepresentations made by him to them; and that he had not deceived them in any particular after the settlement of that date.

"As a result from the authorities, we think a doubtful or disputed claim, sufficient to constitute a good consideraction for an executory contract of compromise," says Mr. Justice BEAN in *Smith v. Farra,* 21 Or. 395, 404 (28 Pac. 241: 20 L. R. A. 115), "is one honestly and in good faith asserted, arising from a state of facts upon which a cause

of action can be predicted, with the reasonable belief on the part of the party asserting it that he has a fair chance of sustaining his claim, and concerning which an honest controversy may arise, although in fact the claim may be wholly unfounded."

In the light of this rule, by giving to defendants' conduct in the assertion of their claim for damages the most liberal interpretation possible, the only demand that they could legally have put forth was that the entire commission of $1,500 inured to McNair, so that the payment which he made for Page and himself to Fawk of money and notes, amounting to $4,935, should be diminished to the extent of the commissions, reducing such sum to $3,435, or to $565 less than paid by Dosch and C. G. Benson. This claim, though wholly unfounded, as we have attempted to show, might have been asserted with a reasonable belief on the part of the defendants that they had a fair chance of recovery. When, however, $4,500 and the transfer of an undivided one-sixteenth interest in the 322 acres of valuable orchard land, estimated by the defendants to be worth $200 an acre, was obtained under the circumstances hereinbefore detailed, in satisfaction of a claim of $565 that might honestly have been put forth, the exaction resembles a method of securing money and property not sanctioned by a court of equity, to say the least. Story's Eq. Juris. (10 ed.) § 239.

2. It is maintained that exemplary damages were recoverable, thereby forming a doubtful or disputed claim, sufficient to constitute a valid consideration for the contract of compromise. As actual malice was not an ingredient of the transaction, such punitive compensation could not form the basis of an honest claim for the settlement that was enforced. *Osmun* v. *Winters,* 30 Or. 177 (46 Pac. 780); *Bingham* v. *Lipman,* 40 Or. 363 (67 Pac. 98).

3. An effort was made at the trial to show that on

compromise, the plaintiff, who certainly had full knowledge of the treatment which he had received, ratified the transaction by sending to a person in Chicago a telegram, wherein it was stated that:

"This deal [referring to the difficulty between himself and the defendants] has been settled to the complete satisfaction of all parties concerned."

The evidence shows that at the request of one of the defendants McNair visited him on the evening of the day stated, and after a labored effort of two hours a message was prepared, containing the information noted, to which that defendant alone subscribed his name, and for the transmission of which he collected from the plaintiff 75 cents and then gave the telegram, marked "collect," to a messenger. Whether or not this message was ever forwarded cannot be ascertained from a careful reading of the testimony. But, however that may be, as the telegram was not directed to either of the defendants, it amounts to nothing more than a mere admission, and does not rise to the dignity of a ratification.

4. We think that, while the plaintiff was not so confined in the office that he could not have unlocked the door, and that, though no physical force was employed to restrain him, he was kept for five hours under such a degree of surveillance, informed that he could not leave the room until he complied with the defendants' demands, and told of the disgrace which an action for fraud would bring upon himself and his family and the ruin which would result to his business, he was so intimidated by superior force as to constitute duress, thereby rendering his transactions void.

5. Complaint is made that the findings of fact do not support the decree. In equity cases on appeal, the findings of fact made by a trial court, through advantageous, are not controlling on the Supreme Court, which, from an examination of the testimony, deduces its own findings and conclusions.

6. The plaintiff, on December 5, 1910, making to Dosch and C. G. Benson a full disclosure of the purchase of the property, and confessing his misrepresentations in respect to the price to be paid therefor, effected a settlement with them which purged his conduct, as far as he was capable of cleansing it, and not attempting to take January 19, 1911, the day after the alleged "voluntary" advantage of his misdeeds, but trying to make amends therefor, he should not now be denied relief, on the ground that he does not come into a court of equity with clean hands.

Believing that the testimony ffully warrants the conclusions of law reached by the lower court, its decree should be affirmed and it is so ordered.

AFFIRMED: REHEARING DENIED.

---

Motion to Correct Mandate Allowed October 1, 1912.
(For original opinion see 61 Or. 396: 122 Pac. 763.)