# TAYLOR ET UX. *v.* GRANT ET AL.

Argued January 12, affirmed as modified January 26, opinion
clarified February 23, petition for rehearing denied
April 6, 1955

279 P. 2d 479
279 P. 2d 1037
281 P. 2d 704

*Elton Watkins,* of Portland, argued the cause for appellants.

*Wilber Henderson,* of Portland, argued the cause and filed a brief for respondents.

Before Tooze, A.C.J., and Rossman, Lusk, Brand, Latourette and Perry, Justices.

TOOZE, A.C.J.

This is a suit in equity to obtain relief, the character of which is hereinafter more particularly pointed out, brought by Henry B. Taylor and Elizabeth A. Taylor, as plaintiffs, against Jasper Grant, Harold F. Thornton, and Portland Trust Bank, a corporation, conservator of the estates of Jasper Grant and Harold F. Thornton, incompetents, as defendants. A decree was entered in favor of plaintiffs, and defendants appeal.

In order to understand and fully appreciate the issues involved in this litigation, a somewhat detailed statement of the facts is necessary. The basis of plaintiffs' present suit is to recover certain monies which they paid out in connection with the attempted purchase of allotted Indian lands owned by defendants Grant and Thornton.

The present suit is somewhat an aftermath of a proceeding heretofore conducted in the United States District Court for the District of Oregon, wherein the United States of America, as trustee and guardian of the estates and persons of Jasper Grant and Harold F.

Thornton, was the plaintiff and Ernestine C. Siniscal, Henry B. Taylor and Elizabeth A. Taylor, husband and wife, William F. Brenner, Elmer A. Reed, Fred M. Marsh, and other persons unknown to plaintiffs herein, designated as first John Doe et al. were defendants. That proceeding resulted in a decree in favor of the plaintiffs and against the defendants, from which an appeal was taken to the Court of Appeals for the Ninth Circuit: *Siniscal v. U. S.*, 208 F2d 406. In the opinion of Judge Denman, speaking for the Court of Appeals, in deciding the matter appears a complete statement of the entire transaction out of which the litigation arose. With a few additions, we adopt that statement of facts as the statement of facts in the instant suit. The lands involved in that litigation are located near Gold Beach, in Curry county, Oregon. Jasper Grant and Harold F. Thornton were the heirs of five original Indian allottees of the land, which is held in trust by the United States government. Patrick Gray, a forester employed in the forestry division of the Indian office, made an appraisal of the land in question in May, 1951, to determine its value as timber land. The appraisal set was $135,000, a figure which the District Court found to be grossly inadequate.

In the same month, that is May, 1951, S. D. Alexander, a white man, contacted Elmer A. Reed, an Indian, about the possibility of purchasing the land involved. A deal was arranged whereby Reed was to purchase and deed the land over to Alexander. Alexander was to pay Reed $12,500 for his services. Under the applicable law and regulations, an Indian could buy this land at its appraised value, but a non-Indian could buy it only after the property had been offered for public bids. 25 USC § 372; 25 CFR 241.11, 241.17-241.33.

In July, Reed and Alexander, accompanied by Grant and Thornton, Indians and beneficial owners of the property, which was held by the United States under trust patents, appeared in the Indian office. There they were informed that the projected deal could not go through, because the ultimate purchaser was Alexander, a white man, and a public offer for bids would be necessary. However, the officers of the Indian bureau secured from the beneficial owners a consent to sell the lands at $135,000, in order to complete the bureau records and "in the event in the future a purchaser could be found  *  *  *."

Also in July, one John C. Blanford approached Reed about making a similar deal and was refused, because of Reed's pre-existing contract with Alexander. Fred M. Marsh was also interested in making the deal and was evidently working with Blanford. Reed suggested that since his daughter, Mrs. Ernestine C. Siniscal, was an Indian, she might be able to make a deal for Blanford.

Reed then talked to Mrs. Siniscal and suggested that she try to put through the transaction for $25,000 for herself. When contacted, by Blanford, Mrs. Siniscal made a deal whereby she was to buy the land and then was to sell it to persons whom Blanford was to contact. Mrs. Siniscal was to receive $25,000 for her services.

Blanford then sought out William F. Brenner, seeking financing for the deal. Brenner contacted Mr. and Mrs. Henry B. Taylor, the ultimate purchasers of the property. At this point it should be stated that the said Taylors are the plaintiffs in the instant suit. Arrangements were made to examine the property. A timber cruiser went along on this examination, and there was talk that there were 30 or 40 million board feet of

timber in the tract, worth around $10 per thousand board feet, making the tract worth at least $300,000.

All of the parties to the deal were aware of the fact that the land could not be purchased except at a public sale by anyone but an Indian. The arrangement ultimately made was that Mrs. Siniscal should purchase the land through the Indian office; that she would then reconvey it to the Taylors; and that $25,000 should be put in escrow to be delivered to Mrs. Siniscal when the Taylors received a marketable title. In pursuance of this arrangement, Mrs. Siniscal appeared at the land office and prepared an application form for the release of restrictions on the land to be purchased. The purpose of this form is to establish the competency of the applicant, so that restrictions upon the property can be removed and the Indian safely entrusted with its future disposition. In filling in financial information, she claimed ownership of property which in fact was owned by her mother and father, and income which in fact was her father's. In answer to the question, "Have you made arrangements to sell your land?" (meaning the land to be purchased), she answered, "No."

The Indian bureau officers then prepared an instrument entitled "Order Transferring Inherited Interests in Indian Lands." This order is used where inherited allotted land is sold by one Indian to another. It causes a change to be made in the government records to reflect the new beneficial ownership, the fee remaining in trust in the United States. The standard form used for this purpose expressly provides that the land remains under the restrictions, but in this case this clause of the form was altered to read, "* * * subject to the express condition that these lands will not be alienated,

sold, or encumbered without the consent of the Secretary of the Interior."

Meanwhile, the Taylors, Brenner, Blanford, and Marsh met in Portland where final arrangements were made. The $25,000 was placed in escrow with the United State National Bank of Portland. Taylor purchased a cashier's check for $135,000, which was used to pay for the land. Mrs. Siniscal then executed a deed to the Taylors, and the Taylors gave Brenner and Marsh an option to purchase the property at $300,000. The Taylors went into possession and had done some preliminary logging operations and felled some trees prior to the commencement of the action in the United States District Court for the District of Oregon.

The United States in its capacity as trustee for Grant and Thornton instituted the action in the United States District Court to recover the lands and to set aside all of the above transactions, on the ground of fraud. Alexander entered the case as an intervenor. Upon the conclusion of the trial in the United States District Court, that court made and entered of record its findings of fact and conclusions of law, and based its decree thereon. Among those findings of fact are the following:

"V.

"Ernestine C. Siniscal, at the time of the transaction herein involved, was acting as a mere agent for hire and as a conduit for title in behalf of defendants Taylor; she was not purchasing on her own behalf or for her own account and was not an Indian within the meaning and intent of the regulations contained in C.F.R. 25, Part 241, and in particular Section 241.11.

"VI.

"False representations as to the actual status, financial responsibility, and intentions of Ernestine

C. Siniscal were made to the Bureau of Indian Of-
fairs [sic] and E. Morgan Pryse, Area Director,
*by defendants Taylor* and their agent Ernestine C.
Siniscal, and others, at the time the transaction in-
volved herein occurred, and prior thereto.

## "VII.

"The defendants Taylor and their agent, Ernes-
tine C. Siniscal, and others, at the time this trans-
action occurred, *concealed* from the Bureau of
Indian Affairs and E. Morgan Pryse, Area Director,
*the fact that the defendants Taylor were in truth the
real buyers* concerned in this transaction.

## "VIII.

"The consideration in this transaction, $135,-
000.00, was grossly inadequate and schocking [sic]
to public conscience and the Area Director, E. Mor-
gan Pryse, at the time he signed the documents in-
volved in this transaction, was unaware of the true
value of the property involved herein.

## "IX.

"The evidence in this case *clearly, certainly and
convincingly* established the fact that *defendants
Taylor,* and those persons acting in concert with
them, were aware of the necessity of the require-
ments for a publicly advertised sale unless the prop-
erty were purchased by a bona fide Indian on his
or her own behalf and account, and that in order to
avoid such requirement, Ernestine C. Siniscal was
by subterfuge presented as an actual bona fide pur-
chaser, and the true identity of defendants Taylor
as purchasers was concealed.

"* * * * *

## "XI.

"In reliance upon *the fraudulent representations
of the defendants Taylor* and persons acting in con-
cert with them, and by reason of the concealment
by the aforesaid persons, all as set forth in Findings
V to IX, inclusive, herein, E. Morgan Pryse, Area
Director, signed the Order Transfering Inhereted

[sic] Interest and the Order Removing Restrictions, which he would not have done had he known the true facts. (Italics ours.)

Among its conclusions of law, the court found and declared:

"By reason of the fraudulent misrepresentations having been made to the plaintiff and to its duly authorized agent, E. Morgan Pryse, by the defendants Taylor and those acting in concert with them, and the concealment, by the aforesaid persons, of pertinent facts from him, and by reason of the fact that the sum of $135,000.00 was a grossly inadequate price to be paid for such land and timber, the entire transaction should be rescinded."

The District Court also found and declared as a matter of fact and as a matter of law that good cause existed for the return to Henry B. Taylor and Elizabeth A. Taylor the sum of $135,000 turned over by them to the area director of the bureau of Indian affairs for the account of Harold Thornton and Jasper Grant. By its decree the District Court adjudged and decreed to be null and void all of the instruments connected with the transaction, thereby effecting a complete rescission. The District Court further ordered and decreed that there should be paid to Henry B. Taylor and Elizabeth A. Taylor the sum of $135,000, together with interest, from the following sources:

"1. All money belonging to Jasper Grant and Harold F. Thornton and now in the possession of the Portland Trust & Savings Bank as Conservator of said Indians shall forthwith be turned over to Henry B. Taylor and Elizabeth A. Taylor.

"2. The lands and timber involved in this suit, including the logs felled and not removed from said property, shall be duly advertised and sold to the highest bidder by the Bureau of Indian Affairs for

the Department of the Interior. From the money so received, after payment of expenses of the sale, the difference between, the amount turned over to the Taylors by the Portland Trust & Savings Bank and $135,000.00 shall be paid to Henry B. Taylor and Elizabeth A. Taylor."

Upon the appeal, the Court of Appeals for the Ninth Circuit affirmed the decree of the United States District Court in all respects except the part thereof last above quoted. It held that the court had no jurisdiction to enter any order or decree against the Portland Trust & Savings Bank, as conservator, because the Portland Trust & Savings Bank, as conservator, had not been made a party to the litigation before the court. It also reversed that part of the decree directing the sale of the lands in question for the purpose of repaying to the defendants Taylor any balance due them after having received the amount then on hand with the Portland Trust & Savings Bank. As to the money on hand with the Portland Trust & Savings Bank, the Court of Appeals states as follows:

"However, as to the approximately $80,000 which is deposited in the Portland Trust & Savings Bank, the state-created conservator for Grant and Thornton, the Indian beneficial owners, a different situation exists.

"The District Court obtained no jurisdiction over the bank and its order that the bank should pay over the deposit is void. Our decision is without prejudice to any right the Taylors may have in a suit against the bank."

The Taylors then instituted the present suit. In their complaint the plaintiffs pray for the following relief:

"1. For a Judgment in favor of plaintiffs and against Jasper Grant for the sum of $67,500.00,

together with interest thereon at the rate of 6% per annum from August 7, 1951, until paid; and

"2. For a Judgment in favor of plaintiffs and against Harold F. Thornton for the sum of $67,-500.00, together with interest thereon at the rate of 6% per annum from August 7, 1951, until paid; and

"3. For a Decree declaring that the funds in the hands of the Portland Trust Bank as Conservator of the Estates of Jasper Grant and Harold F. Thornton, to-wit:

"As to Jasper Grant:

| | |
|---|---|
| U.S. Treasury Bonds | $20,000.00 |
| Savings Account | 5,000.00 |
| Checking Account | 372.64 |
| Total | $25,372.64 |

"As to Harold F. Thornton:

| | |
|---|---|
| U.S. Treasury Bonds | $30,000.00 |
| Savings Account | 9,000.00 |
| Checking Account | 347.97 |
| Total | $39,347.97 |

are held by the defendant Portland Trust Bank as such Conservator in trust for the plaintiffs, and decreeing that the defendant Portland Trust Bank shall pay said moneys and deliver said funds to the plaintiffs on account of such judgment as may be rendered by the Court against said defendants Jasper Grant and Harold F. Thornton; and

"4. For an Injunction Pendente Lite restraining the defendant Portland Trust Bank from disbursing any of the funds aforesaid held by it as Conservator of said defendants Jasper Grant and Harold F. Thornton to any person or for any purpose whatsoever until this suit has been determined; and for a Decree permanently restraining the said defendant Portland Trust Bank from paying said funds to any person other than the plaintiffs; and

"5. For a Decree impressing a lien upon the property described in Paragraph III. in the amount of such judgment as shall be awarded plaintiffs against defendants Jasper Grant and Harold F. Thornton, and for a permanent injunction restraining defendants Jasper Grant and Harold F. Thornton from disposing of any money received on account of the sale of the aforesaid land until the judgment awarded plaintiffs and against them has been discharged; and".

In their answer to the plaintiffs' complaint the defendants Jasper Grant and Harold F. Thornton, for themselves, admit and deny certain of the allegations of the complaint, and then set forth their affirmative defense. After alleging in substance all of the facts as hereinabove set forth, they allege as follows:

"That because of the facts set forth herein and the adjudication of said facts by the Courts hereinabove mentioned, the claims of the plaintiffs herein are based upon and arise from their own misconduct in their attempt to defraud these defendants, and therefore plaintiffs do not come into this court with clean hands."

The answer of defendant Portland Trust Bank consists of admissions of certain portions of plaintiffs' complaint and denials of others. No affirmative defense is alleged. Plaintiffs replied to the new matter contained in the answer of the defendants Grant and Thornton, admitting and denying portions thereof. After hearing, the trial court entered its decree as follows:

"It hereby is ORDERED, ADJUDGED and DECREED: That plaintiffs *have judgment against the Portland Trust Bank as Conservator* of the estate of Jasper Grant for the sum of $25,209.89, and against the Portland Trust Bank as Conservator of the Estate of Harold F. Thornton for the sum of

$39,484.85, said amounts representing the full balance in the possession of said defendant belonging to the respective parties, and it is decreed that a trust in favor of plaintiffs hereby is impressed upon said funds in the hands of said Portland Trust Bank as Conservator of the Estates of Jasper Grant and Harold F. Thornton respectively; and that neither plaintiffs nor defendants shall recover costs herein; and

"It further is ADJUDGED and DECREED: That this Decree is without prejudice against the plaintiffs for any claim they may have against either the Defendant Jasper Grant or the Defendant Harold F. Thornton in respect to the subject matter ($135,000.00) of the suit entitled 'The United States of America, as Trustee and Guardian Ex Rel. of the Estates and Persons of Jasper Grant and Harold F. Thornton, versus Ernestine C. Siniscal, Et Al.', instituted in the United States District Court for the District of Oregon, Clerk's Registry No. Civil-6374 as finally determined by the Circuit Court of Appeals for the Ninth Circuit in an appeal from the Decree in said proceeding."

In the light of the foregoing statement, it is obvious that the principal question for decision on this appeal is whether the plaintiffs, who were guilty of fraudulent conduct in connection with the transaction hereinabove described, are barred from all relief in this case because of the equitable doctrine that he who comes into equity must come with clean hands. The fraud perpetrated was against the incompetent Indians themselves, although the means employed involved subterfuges to evade the laws of the United States and regulations adopted pursuant thereto, for the protection of Indians. There is no question but that the instant suit is an attempt by the plaintiffs to escape at least some of the consequences of their original wrongdoing. Ordinarily equity will deny all relief in such cases. The

general rule is well stated in 30 CJS 475, Equity, § 93, as follows:

"The maxim that he who comes into equity must come with clean hands according to the authorities listed in the notes, is of ancient origin and broad application. It is a cardinal maxim and the expression of the elementary and fundamental conception of equity jurisprudence. * * * It means that equity refuses to lend its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief. Equity denies affirmative relief for such conduct even though it thereby leaves undisturbed and in ostensible full legal effect acts or proceedings which would affirmatively be set aside but for such consideration.

"*The maxim is based on conscience and good faith. It is not strictly or primarily a matter of defense, but is invoked on grounds of public policy and for the protection of the integrity of the court.*"

(Italics ours.)

The foregoing statement of the rule is in keeping with a long line of decisions by this court. Our latest expression upon the subject is found in the case of *Merit v. Losey,* 194 Or 89, 240 P2d 933, where we said (p 102):

"So far as the relief sought by plaintiff herein calls for a declaration that defendant has no rights in the real property and that her name should be stricken from the contract of sale, such relief is of equitable cognizance. The inclusion of defendant as a vendee in the contract was a matter which arose out of and as an incident of the unlawful and meretricious cohabitation of the parties, and the dilemma in which plaintiff now finds himself resulted from wrongdoing in which the parties were at least in *pari delicto.* Plaintiff, in seeking the aid of equity to extricate him from such a situation, does not come

into court with clean hands, and equity will not aid him. 30 CJS Equity, § 93, note 88; Reid v. Multnomah County, 100 Or 310, 328, 196 P 394; Slovanian L. & S. Assn v. City of Portland, 111 Or 335, 356, 224 P 1098; Blake v. Kimble et ux, 120 Or 626, 630, 253 P 522; 2 Pomeroy, Eq. Jur., 5 ed, § 397 et seq. Nor will any court, whether of law or equity, permit a party to found any claim upon his own iniquity. 1 Am Jur, Actions § 16, note 7; Smith v. Germania Fire Ins. Co. of N. Y., 102 Or 569, 574, 202 P 1088, 19 ALR 1444.

"Although the unconscionable character of the transaction was not pleaded as a defense herein, the cause is heard *de novo* on appeal, and this court takes note of it as revealed by the evidence, and in respect thereof invokes the clean hands doctrine of its own motion. 30 CJS, Equity, § 97."

In 2 Pomeroy 91, Equity Jurisprudence 5 ed, § 397, after discussing the equitable maxim, "he who seeks equity must do equity", the author states:

"* * * On the other hand, the maxim now under consideration, He who comes into equity must come with clean hands, is much more efficient and restrictive in its operation. It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him *all* recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as *actor,* seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy."

■ However, it is well established that the clean-

hands maxim has its limitations, as stated in 30 CJS 487, Equity, § 98:

"The clean hands maxim has its limitations. It does not operate so as to repel all sinners from a court of equity, nor does it apply to every unconscientious act of a party. As indicated infra this section, equity will consider the conduct of the adversary, the requirements of public policy, and the relation of the misconduct to the subject matter of the suit and to defendant. Further, although, as pointed out supra § 95 a, a party may be guilty of such unconscionable conduct during the progress of litigation that equity will refuse relief to him, *with respect to antecedent conduct it is as of the date of the filing of the bill of complaint, or on the conditions existing at the time when the party applies for equitable relief, that such party's conduct is usually appraised.*

"*The maxim will not be allowed to work injustice and wrong, nor will it be applied contrary to settled rules of equity jurisprudence. The doctrine is a weapon of defense; it is not a muniment of title. In some cases, relief may be given while imposing a condition of such a character as to eliminate the asserted wrong; and a party purging his conduct as far as possible has obtained relief. Where equity has assumed to act, it must do complete justice regardless of whether the litigants originally came into court with clean hands.*" (Italics ours.)

This court has heretofore had occasion to recognize and apply limitations upon the maxim, as examples see *Dickerson v. Murfield,* 173 Or 662, 147 P2d 194; *Platt v. Jones,* 149 Or 246, 38 P2d 703, 39 P2d 955; *McNair v. Benson,* 63 Or 66, 126 P 20. The question then arises whether under all the facts and circumstances of this case we should apply the maxim or recognize the situation now before us as one coming within the limitations upon the maxim. In considering this question we must

keep in mind that the beneficial interest in the lands involved has been entirely restored to the defendants Grant and Thornton. They have also had the use of and perhaps squandered approximately $70,000 of the original $135,000 paid by the plaintiffs in this case. All that remains of the original sum of $135,000 is the money now in possession of the defendant Bank, as conservator of the estates of its codefendants.

■ It is elementary that a contract induced by fraud is not a void contract; it is simply voidable. For the fraud, the injured party has an election of remedies; he may disaffirm the contract and bring suit in equity for its rescission and cancellation, or he may affirm the contract and sue at law for damages. If he disaffirms the contract and brings suit in equity to rescind and cancel it, equity will usually demand as a condition for awarding him that relief that he restore the other party to status quo. This condition is imposed under the maxim that he who seeks equity must do equity. The rule is well stated in 9 Am Jur 384, Cancellation of Instruments, § 39, as follows:

"Under the maxim of equity that he who seeks equity must do equity, the plaintiff in an action to cancel or rescind an instrument must generally, as a condition of obtaining such relief, restore the defendant to the position which he occupied before the transaction in question. The plaintiff is generally required to restore, or offer to restore, the benefits he has received, not as a condition of acquiring the right to sue, but because of the equitable maxim that he who seeks equity must do equity. Certainly the plaintiff will not be allowed to derive any unconscionable advantage from the cancelation, and usually he will be denied relief when it is not possible substantially to restore the defendant to the status quo. The mere inability of the plaintiff to make restoration does not relieve him of his obligation to

do so, or permit the court to grant him relief. Thus, a vendor of land who sues in equity to rescind a conveyance or cancel a recorded contract to convey will be required to restore the consideration received by him."

■ The foregoing rule applies to incompetents and persons who labor under a legal disability, such as infancy. As stated in 9 Am Jur 386, Cancellation of Instruments, § 42, such persons "are required, as a condition of obtaining relief from their contracts, to restore the consideration received, to the extent, at least, that it remains undisposed of during the existence of their disability." However, there is a well-established exception to the foregoing rules. In a suit by the United States to cancel a conveyance made by an Indian ward of land allotted to him by the United States, in violation of a restriction upon alienation, the return of the consideration by the United States is not an essential prerequisite to a decree of cancellation. *Heckman v. United States,* 224 US 413, 56 L ed 820, 32 S Ct 424. We quote the following from the Heckman case (p 446 of 224 US):

"It is said that the allottees have received the consideration and should be made parties in order that equitable restoration may be enforced. Where, however, conveyance has been made in violation of the restrictions, it is plain that the return of the consideration cannot be regarded as an essential prerequisite to a decree of cancellation. Otherwise, if the Indian grantor had squandered the money, he would lose the land which Congress intended he should hold, and the very incompetence and thriftlessness which were the occasion of the measures for his protection would render them of no avail. The effectiveness of the acts of Congress is not thus to be destroyed. The restrictions were set forth in public laws, and were matters of general knowledge.

Those who dealt with the Indians contrary to these provisions are not entitled to insist that they should keep the land if the purchase price is not repaid, and thus frustrate the policy of the statute. United States v. Trinidad Coal Co., 137 U.S. 160, 170, 171.

"But it is suggested that there may be instances where the consideration could be restored without interfering with the policy which prohibited the transfer; that is, without in any way impairing the right to the recovery of the land or the assurance to the Indian of his possession free from incumbrance. It is said, for example, that there may have been an exchange of lands, and that the Indian grantor should not, on retaking the restricted lands, be permitted at the same time to retain those which he has received from the grantee. Or there may be other property held by the Indian grantor free from restrictions, so that restoration of the consideration may be enforced without working a deprivation of the restricted lands contrary to the act of Congress. We need not attempt to surmise what cases of this sort may arise. It is sufficient to say that no such case is here presented. It is not presented by the mere allegation of the bill that the conveyances assailed purport to have been made for pecuniary consideration. *It will be competent for the court, on a proper showing as to any of the transactions that provision can be made for a return of the consideration, consistently with the cancellation of the conveyances and with securing to the allottees the possession of the restricted lands in accordance with the statute, to provide for bringing in as a party to the suit any person whose presence for that purpose is found to be necessary.*" (Italics ours.)

It will be observed from the foregoing that the Supreme Court did not deny the equitable doctrine requiring a return of the consideration. On the contrary, it expressly approved the doctrine where it could be applied without violating the public policy of the United States as established by the acts of Congress.

In the suit instituted and prosecuted by the United States in the United States District Court, the trial judge recognized and sought to apply the principle. As before noted, the court declared as a matter of fact and of law that the plaintiffs in this case were entitled to a return of the consideration they paid in connection with the transaction. That portion of the trial court's decree designed to enforce restoration failed only for the reasons stated by the Court of Appeals as follows: (1) because of the public policy of the United States, the District Court had no jurisdiction to impress a lien upon and direct the sale of the lands in question; and (2) as to the money remaining in the hands of the Portland Trust Bank (designated as Portland Trust & Savings Bank), because the Bank had not been made a party to the litigation, and, therefore, the District Court had no jurisdiction to enter a judgment against it. *Siniscal v. U. S.*, supra.

It is highly significant that, in reversing the part of the decree affecting the funds in possession of the Bank, the Court of Appeals did so "without prejudice to any right the Taylors may have in a suit against the bank." It is manifest that had the Bank been made a party to the suit, the decree of the trial court respecting the funds in its hands would have been affirmed. Such action would have been in keeping with the ruling in the Heckman case, as above quoted and emphasized. In a sense, the instant suit is a mere continuation of the litigation prosecuted in the federal courts, and designed solely to accomplish what the United States District Court, sitting in equity, determined should be done in the premises.

■ Therefore, prior to the commencement of the instant suit, a court of equity had solemnly found and determined that the money now in litigation belonged to

plaintiffs, and that in equity and good conscience it should be returned to them. Certainly no equities exist in favor of the defendants Grant and Thornton in so far as the retention of these funds is concerned.

■ Under all the facts and circumstances of this case, to permit defendants to retain and use these funds as their own could be justified only upon the theory that plaintiffs should be further punished for their original wrongdoing. Although it has been held that the principle of withholding relief from a complainant because of unclean hands is punitive in nature *(Busch v. Baker,* 79 Fla 113, 83 So 704), yet the better rule, and the one most consistent with the basic ideals of equity, is that the maxim is not invoked for purposes of retribution or punishment *(Harris v. Harris,* 208 Ala 20, 93 So 841; *Sherwood Co. v. Sherwood Distilling Co.,* 177 Md 455, 9 A2d 842; *Smith v. Ajax Pipe Line Co.,* 87 F2d 567).

We are of the opinion that the instant suit presents a situation that comes or should come within the limitations placed upon the application of the clean-hands doctrine. We appraise plaintiffs' conduct as of the time the complaint was filed in this suit and in the light of all that transpired theretofore. We are firmly convinced that to apply fully the clean-hands maxim in this case, with its attendant consequences, would indeed work injustice and wrong. But we do not intend to treat the maxim lightly nor to depart one iota from what we have heretofore said respecting it.

■ However, there is another aspect of this case that must not be overlooked. The defendant Bank has performed valuable services and incurred expenses, largely by way of attorneys' fees, in protecting and preserving these funds now in its hands as conservator. From what happened to approximately $70,000 of the money paid by plaintiffs, it may safely be assumed that

the same thing would have happened to the money yet remaining, had it not been for the conservatorship. At the time the Bank was appointed conservator by the probate department of the circuit court for Multnomah county, the monies in litigation belonged to the defendants Grant and Thornton; the transaction had not yet been set aside. The Bank's appointment was in every way regular and proper and pursuant to our statutes. The probate court allowed and directed payment to the Bank and its attorneys out of these funds reasonable sums as compensation for their services performed in connection with the conservatorship; the payment of the ordinary costs and expenses of administration of the estates was also ordered. Prior to the issuance of an injunction in this suit to restrain the Bank from making further disbursements from the funds pending litigation, a portion of the amount allowed the Bank, as well as a portion of that allowed the attorneys, had been paid, but there remain substantial sums due them pursuant to the orders of the probate court. Moreover, the Bank and the attorneys have been compelled to perform further services and incur additional expenses in connection with the instant litigation.

In equity and good conscience the Bank and the attorneys should be paid for their services, and the Bank should be reimbursed for all the costs and disbursements it has incurred in this suit. In truth, they are the only parties connected with this suit whose hands are entirely clean. Had it not been for them, it is likely there would not have been any of the money left for plaintiffs to seize upon. As the matter has turned out, their services were, therefore, of great value to plaintiffs.

In the United States District Court the plaintiffs were brought into court as defendants against their

will. As defendants, they might obtain equitable relief
that would be denied them as plaintiffs under the clean-
hands maxim; but in the instant litigation plaintiffs
are the moving parties. They affirmatively seek equi-
table relief. At the threshold of their suit, they are met
by the equitable maxim that he who seeks equity must
do equity. The demands of equity in this case can be
met only if the Bank and its attorneys are compensated
for their services, and the Bank is fully reimbursed for
its costs and disbursements and the ordinary costs and
expenses of administering the conservatorship remain-
ing unpaid, if any.

In their complaint in the instant suit plaintiffs
sought to recover the entire fund remaining in the
hands of the defendant Bank, without making an offer
that the compensation awarded by the probate court
to the Bank and its attorneys should first be paid.
Although seeking the aid of equity, plaintiffs in their
complaint did not offer to do equity. When decree was
entered herein, plaintiffs sought, by execution, to seize
all the monies in the hands of the Bank. About the same
time the probate court ordered the Bank to appear and
show cause why it should not be adjudged guilty of
contempt for failure to comply with the order of that
court directing the payment of the compensation
awarded for services in the conservatorship matter.
This presented a direct conflict between the jurisdic-
tions of the probate court and the circuit court sitting
in equity. The Bank was caught "between the devil and
the deep sea." If it paid the compensation as ordered
by the probate court, it faced contempt proceedings
for violation of the injunction issued in this suit; if it
did not pay it, the probate court threatened punish-
ment. Faced with this dilemma, the Bank instituted
original mandamus proceedings in this court, naming

the trial judge and the probate judge as defendants, and all proceedings were stayed both in this suit and in the probate court until the mandamus case could be heard by us and determined. Thus the necessity of the mandamus proceedings instituted by the Bank was caused solely by reason of plaintiffs' failure to offer to do equity when their complaint was filed, or at least when decree was entered.

This suit is tried de novo in this court. In the light of the entire record, and pursuant to the suggestion contained in 30 CJS 489, Equity, § 98, we modify the decree of the trial court, and make as conditions to the granting of any relief to plaintiffs herein the following:

1. The Bank and its attorneys shall receive payment in full of the compensation heretofore fixed by the probate court of the circuit court of Multnomah county for their services in connection with the conservatorship; and

2. The Bank shall receive an additional sum of $200, and its attorneys, the additional sum of $1,000, for their services in this litigation;

3. The Bank shall be reimbursed in full for any ordinary costs and expenses incurred by it in administering the conservatorship, if any remain unpaid; and

4. The Bank shall recover and be paid its costs and disbursements in this suit, both here and in the trial court, and also its costs and disbursements in the mandamus proceeding.

When all of the foregoing payments have been made out of the funds in litigation, the balance of such funds remaining in the hands of the Bank, as conservator, shall be paid to plaintiffs.

Except as modified, the decree is affirmed.

On Petition for Clarification

*Elton Watkins,* Portland, for the petition.

Opinion clarified.

TOOZE, A.C.J.

Defendants have filed a petition with this court asking for a clarification of the conditions set forth in our original opinion for the granting of affirmative relief to the plaintiffs. Those conditions are:

"1. The Bank and its attorneys shall receive payment in full of the compensation heretofore fixed by the probate court of the circuit court of Multnomah county for their services in connection with the conservatorship; and

"2. The bank shall receive an additional sum of $200, and its attorneys, the additional sum of $1,000, for their services in this litigation;

"3. The Bank shall be reimbursed in full for any ordinary costs and expenses incurred by it in administering the conservatorship, if any remain unpaid; and

"4. The Bank shall recover and be paid its costs and disbursements in this suit, both here and in the trial court, and also its costs and disbursements in the mandamus proceeding."

It is pointed out to us in the petition that as yet there has been no allowance of compensation to the Bank or to its present attorneys for services performed by them in the matter of the estate of Jasper Grant. The only allowances of compensation to either the Bank or its present attorneys were made in the estate of Harold F. Thornton, those being the fees discussed in our original opinion. The two conservatorship proceedings were entirely separate and independent of each other, although it is obvious that much of the service performed both by the Bank and its attorneys was common to both estates.

■ In condition No. 3 above it will be noted that we provided for payment to the Bank of the ordinary costs and expenses incurred by it in administering the conservatorship, if any remain unpaid. That applies to both conservatorship proceedings. This would include the costs and expenses, if any, of closing the estates in the probate court. It also would include the allowance of such reasonable sums in the Jasper Grant conservatorship as may be proper for the services of the Bank as conservator and for the services of its attorneys in that proceeding, such compensation to be fixed by the probate court and paid out of the funds in the hands of the Bank.

■ Defendants suggest that they are uncertain whether attorneys' fees for the prosecution of the mandamus proceeding should be allowed, as we allowed costs and disbursements to the Bank in that action. The answer is that the attorneys are not entitled to attorneys' fees in that particular litigation. See condition No. 2 above. We considered the mandamus proceeding a mere incident of the principal case.

Except as clarified herein, we adhere to our original opinion.

### On Petition for Rehearing

*Wilber Henderson,* of Portland, for the petition.

*Elton Watkins, Leroy L. Lomax,* and *John K. Crowe,* all of Portland, attorneys for appellants.

Before Tooze, A.C.J., and Rossman, Lusk, Brand, Latourette and Perry, Justices.

■■■■■■■■

TOOZE, A.C.J.

The plaintiffs have filed a petition for rehearing directed solely to that portion of our original opinion which imposed conditions upon the allowance of

equitable relief to them. We allowed the petition of defendants for a clarification of these conditions, and did clarify them.

Plaintiffs complain that the court did not consider their contentions submitted in writing when the petition for clarification was pending respecting the conditions imposed by us in our original opinion. In that supposition, plaintiffs are mistaken. We did consider them, but deemed it unnecessary to mention them in our opinion of clarification.

Plaintiffs then maintained, and in their petition for rehearing insist, that there is no factual basis in the record of this case upon which to base the subject matter of the conditions imposed. They argue that every case must be decided upon the record in that particular case, and that the court is without authority to go outside the record and base its decision upon evidence aliunde. That rule is elementary as it applies to the merits of a controversy. We did not violate the rule in this litigation.

It is apparent that plaintiffs overlook the real basis and purpose of the conditions imposed. On the merits, we decided that plaintiffs did not come into court with clean hands. That conclusion was based strictly upon the record before us in this case. We also decided from the record that plaintiffs had not in their pleadings, or at any other time, offered to do equity. Had we stopped there, and under well-recognized principles of equity jurisprudence, we would have been compelled to close the doors of the court to plaintiffs, leaving the parties exactly where we found them.

However, despite plaintiffs' wrongdoing and unclean hands, we were of the opinion that under all the facts and circumstances of this case it would be unjust to further penalize plaintiffs for their fraud by

depriving them entirely of the remaining funds. This being an equitable proceeding, and the arms of equity being long and far-reaching, we were of the opinion that we were justified in recognizing a limitation upon the application of the "clean hands" doctrine and had the authority to do that which equity and justice seemed to demand. It must be kept in mind that we tried this case de novo.

Enough was brought to our attention by the record in this case to show that justice demanded that certain conditions should be imposed upon plaintiffs before they were permitted to escape the usual consequences of the application of the doctrine of "unclean hands." Our determination that conditions should be imposed was based entirely upon the record before us.

■ However, the nature and extent of the conditions to be imposed had nothing whatever to do with a decision on the actual merits of the controversy. In this case we sought to impose conditions that had some direct relation to the controversy between the parties, although, in doing equity, we were in no sense limited by such a consideration. We are of the opinion that we had the authority to impose any reasonable conditions that might appear to us to be equitable and proper under the circumstances.

It must be remembered that there was pending before us an original proceeding in mandamus, in which proceedings in the conservatorship matter were at issue, as well as proceedings in the instant litigation. We have treated the mandamus proceeding as an incident of the principal case. We were not required to go outside the records of our own court to secure the information necessary to impose the conditions which we did impose.

The petition for rehearing is denied.