# BRISTOL *v.* STATE TAX COMMISSION

Edwin J. Peterson, Portland, argued the cause for plaintiff. With him on the brief were Tooze, Powers, Kerr, Tooze & Morrell, Portland.

Alfred B. Thomas, Assistant Attorney General, Salem, argued the cause for defendant. With him on

the brief was Carlisle B. Roberts, Assistant Attorney General, Salem.

Decision rendered August 31, 1962.

PETER M. GUNNAR, Judge.

This is a suit in which the plaintiff seeks to set aside an assessment of additional income taxes for the year 1956 and follows a hearing before the State Tax Commission which resulted in its opinion and order No. I-62-2, adverse to the plaintiff.

This case concerns the basis, and the gain or loss upon sale, of all the shares of a Washington corporation held by a decedent's estate. Briefly, the stipulated facts are as follows: Upon the death of its decedent in 1947, the estate of which the plaintiff is the administrator acquired all the stock of a Washington corporation. The plaintiff sold this stock in 1956 for $45,000. For income tax purposes, the plaintiff's basis in the stock is the value at the date of the decedent's death. The plaintiff contends that the basis is $45,000, resulting in no taxable gain, while the defendant contends for a basis of $4,500, resulting in $40,500 of taxable gain, Thus, basically, the issue in this case is one of fact, not legal principles.

What this court said today in *Sproul v. State Tax Commission*, 1 OTR 31, 1962, concerning the burden of proof, quantum of proof, and the presumption of assessment validity in income tax abatement cases in this court applies with equal force in this case.

■ The plaintiff taxpayer seeking to abate the additional assessment of income taxes has the burden of proof.

■ He must sustain this burden by a preponderance of the evidence; he must establish that the facts asserted by him are more probably true than false.

■ Among the matters of evidence to be considered by this court is the presumption of assessment validity. This court-created presumption, as all presumptions in Oregon, is of an evidentiary nature and has probative value. It does not "disappear" as soon as contrary evidence is introduced, but remains in the case to be considered by the court with the "other evidence."

■■ However, this presumption does not alter the quantum of proof required. It merely is part of the "evidence" considered in reaching a decision. The court assigns to it such weight as the circumstances warrant, having due regard for the expert or technical nature of the court.

These precepts were fully discussed in *Sproul v. State Tax Commission, supra,* and there is no point in repeating that discussion. They are set forth here merely as a starting point in considering the evidence in this case, as the basis upon which the facts of this case must be analyzed and interpreted.

This court in the *Sproul* case noted three methods open to the taxpayer in dealing with the presumption of assessment validity. In this case, the taxpayer has chosen the second course of action. He seeks first to destroy the presumption by destroying the basis upon which the commission acted and then, having dispensed with the presumption, to adduce more weight of evidence on the issue of basis and gain than the commission adduces.

Thus, the issues in this case can be stated in two questions:

1. Did the taxpayer overcome the presumption by showing its basis to be false?

2. Did the taxpayer prove a fair market value of

the stock in question on the date of death of the decedent, July 24, 1947, different (either more or less) than that upon which the assessment was based? It was assumed at the trial by both parties that this basis did not change between the date of the decedent's death and the date of sale in 1956.

## THE EVIDENCE

The facts as presented to this court are rather confused and the record made before this court, in all charity, is no better than "very thin." The decedent, William C. Bristol, an attorney of the City of Portland, died in 1947. At the time of his death he was the owner of all the outstanding stock of Toke Point Oyster Co., Consolidated, a Washington corporation, which owned certain oyster beds off Toke Point, Washington.

Apparently, Toke Point Oyster Co., Consolidated, was organized in 1917 in a consolidation of a number of smaller companies, with the decedent and certain Star brothers as the shareholders. Sometime subsequent to 1917, the decedent became the sole shareholder by purchasing the shares owned by the Star brothers for $50,000.

In 1917, a bond issue of $163,000 was issued and sold by Toke Point Oyster Co., Consolidated. The decedent owned slightly more than $8,000 of these bonds and approximately $154,900 of these bonds were held by others. The bonds matured serially with the last of the bonds maturing in January, 1937. There is no evidence of any payment of these bonds made in the intervening ten years until the death of the decedent.

About 1942, Toke Point Oyster Co., Consolidated, having been inactive for some years, leased its oyster

beds and other properties to Paragon Packing Company for an annual rental of $8.50 an acre. At the time of the lease much preparatory work needed to be done, as many of the beds were in poor condition. Paragon Packing Company was to pay this rental with respect to the acres actually used each year. The evidence is vague, but apparently the ultimate acreage used was approximately 320 acres.

Sometime during the period 1940-42, persons by the name of Zilka, Bueermann, and Burkhardt purchased all the outstanding bonds then in default, other than those held by the decedent, for $30,000.

On July 24, 1947, the decedent died, and later that month his son, Henry C. Bristol, was appointed the administrator of his estate. The administrator immediately began negotiations with the bondholders, in an attempt to realize upon the stock held by his father's estate.

At first, the stock was not inventoried in the estate. The administrator contended that it was omitted because there was some doubt in his mind as to its ownership and value. Yet from the death of his father in July, 1947, until May, 1948, the administrator negotiated both with the bondholders to purchase their interests, if any, and with the lessee of the beds to sell the beds and the company to it. After some negotiations, he received the oral agreement of the bondholders to sell the bonds for $30,000. He then arranged an agreement with the lessee to sell to it one-half of his father's stock for $23,500, payable $5,000 down and $18,500 upon the estate being able to convey clear title. This agreement (Exhibit 1) was entered into in writing on May 24, 1948. On May 17, 1948, or shortly thereafter, a supplemental inventory and ap-

praisement was filed, valuing the stock at $4,500. The attorney for the estate, Burton L. Coan, Esquire, testified that he was the one who prepared the inventory and chose the figure $4,500 and that it was a "nominal" figure. He went on to testify that the use of this figure kept the estate below a total value of $10,000, and not subject to state inheritance tax. He testified that he picked the figure out of the air, and that $1.00 would have been more appropriate, and that the estate, having no money, couldn't have paid any inheritance or estate taxes, if he had set a higher figure on the stock.

The administrator then sought to complete his purchase of the bonds, but he soon found that the bondholders had changed their minds and were not going to perform their oral agreement with him. This change of mind came about because, in the meanwhile, Coast Oyster Company and Willapoint Oyster Company had purchased the bonds under an agreement (Exhibit 2) with the bondholders to pay them $40,000 for the bonds. In turn, the bondholders began making offers for the purchase of the stock held by the estate, offering first $10,000, and then in rapid succession $15,000 and $25,000. All these offers, made within about 50 days, were refused by the administrator. On July 12, 1948, the administrator was handed a written ultimatum (Exhibit 3), offering to pay $25,000 for the stock and saying that, if the administrator refused, a suit would be filed on behalf of the bondholders within two days. The administrator refused, and the suit, or, more accurately, two suits, were filed. A suit to foreclose on the bonds was filed against Toke Point Oyster Co., Consolidated, in the State of Washington, and a claim against the estate of the decedent was filed in the probate proceeding of this decedent's estate in Oregon.

The Oregon claim was denied, and objections (Exhibit 5) were filed by the bondholders to the final account in July, 1948.

Under the agreement (Exhibit 1) of May 24, 1948, Paragon Packing Co. and the administrator defended against the suit in Washington and against the objections filed in Oregon. This litigation dragged on for some time and never actually came to the point of trial.

Throughout the period of 1948-50, negotiations continued between Willapoint Oyster Company and the administrator. In April, 1950, as a final offer, Willapoint Oyster Company offered to purchase the stock of the estate for $32,500 (Exhibit 4). This offer was turned down by the administrator, and the litigation and negotiations continued. After three years of further negotiations, Willapoint Oyster Company and, presumably, Coast Oyster Company offered the estate $45,000 for the stock. This offer the administrator saw fit to accept. In order to do so, he obtained from Paragon Packing Co. a release from liability under the agreement of May 24, 1948. Finally, in 1954, Willapoint Oyster Co., the estate of the decedent, and the bondholders entered into an agreement (not entered in evidence, but described as about 20 pages and prepared by Bogle, Bogle & Gates, of Seattle) under which Willapoint Oyster Co. purchased the stock for $45,000 and the bonds for $30,000. All the transactions were not completed finally until 1957, inasmuch as the administrator had agreed to protect the beds planted by Paragon Packing Co., which he did.

There is no evidence as to the validity of the bond issue. Apparently, the estate and Paragon Packing Co. were defending the two suits on the basis of the

statute of limitations. Except for testimony that the property was assessed in 1947 and again in 1954 for ad valorem tax purposes in the State of Washington at approximately $11,000, and that the ratio of assessed to market value was 25 per cent, there is no evidence as to the value of the beds, the other land of the Toke Point Oyster Co., or its other property. Neither party offered any balance sheet or profit and loss statement for the corporation. No market data was presented. Nonetheless, from this skeleton record, the parties expect this court to determine the market value of the stock in question in July, 1947, in order to establish its basis for sale in 1956.

## THE PRESUMPTION OVERCOME

A copy of the opinion and order No. I-62-2 of the State Tax Commission was attached to the complaint and is before the court upon this appeal. The commission made its finding of value on two grounds: (1) That the outstanding bond issue of $163,000 made the stock of little or no value to a prospective purchaser, and (2) that the estate valued the stock for inventory and inheritance tax purposes at $4,500. The taxpayer attacked the second ground with the testimony of Mr. Coan that he inserted this figure as a "nominal" figure, that a figure of $1.00 would have been better and more appropriate, and that at the time of the inventory the administrator and his attorney did not know the value of the stock. On examination by the commission's counsel and the court, the witness admitted that the estate had no money to pay inheritance taxes and that the figure of $4,500 was used to keep the value of the estate well below the $10,000 exemption for inheritance taxes. At no

point was there any substantial evidence that supported the value of $4,500, other than the supplemental inventory, which was explained, and some hearsay evidence as to assessed value which might be so construed.

■ As to the bond issue, its last bonds matured in 1937. Under the Washington law, these bonds would have become valueless under the Washington statute of limitations in 1943. RCW 4.16.040. Neither counsel bothered to cite or provide to the court the appropriate Washington statute, but under ORS 41.420 this court takes judicial notice of it. No evidence was adduced showing the statute to have been tolled. Subsequently, suits were filed to enforce these bonds, but no evidence was presented as to the nature of those claims and their legal foundation in the face of the statute of limitations. Copies of the pleadings and other proofs were readily available to the commission. The failure to produce them gives rise to an adverse presumption. ORS 41.360.

The only evidence as to the value of the bonds was $30,000 and $40,000, the amounts offered for them and accepted by the bondholders on two or three different occasions. At the time of these offers, the stock held by the estate had a value over that of the bonds of $10,000 to $45,000. While it might be presumed that the outstanding, probably invalid, bonds would have a cautionary effect upon a prospective purchaser of the stock, it cannot be said to reduce the stock value to a figure as low as $4,500.

The two bases for the commission's opinion and order having been shown to be erroneous and without support in fact, the presumption of assessment validity is controverted and overcome.

## THE VALUE QUESTION

The question then before the court is: What did the evidence presented prove as to fair market value of the stock on July 24, 1947? The answer is that no particular value was shown to be more probably true than false.

The commission adduced no evidence independently except two exhibits. One exhibit was the deposition of Mr. Coan on the "nominal value" issue discussed above, and the other was a letter from Coan to the commission requesting an audit of the estate for income taxes in December, 1956. Neither went to the value of the stock. Thus, the entire commission case rests upon the testimony on cross-examination.

The taxpayer's case on value is little better. Admittedly, at the date of death of the decedent all the stock of Toke Point Oyster Co., Consolidated, was owned by the decedent. The corporation was not an operating company. Instead, it leased to Paragon Packing Co. all its assets, consisting only of oyster beds and negligible other real and personal property. It had no going-business value. Obviously, the value of the stock equalled the value of the assets, adjusted by its valid and subsisting encumbrances. It probably could be valued best in the same manner as the stock of an apartment house corporation. In other words, the cost, income, and comparable sales approaches would appear applicable here.

■ In any event, in the valuation of the stock of closely-held corporations, the place to start is book value, as it is *prima facie* the true value. *In re Estate of Frank,* 123 Or 286, 290, 261 P 893 (1927).

Amazing as it may seem, there is no evidence as to book value. There is no competent evidence as to

market value of the assets based upon appraisals. There is some secondary evidence as to the assessment of the oyster beds at $44,000 fair market value and $11,000 assessed value by the county assessor, but no tax statements were offered showing these assessments and no showing as to the ratio was made in proper or reliable form. Furthermore, if the bonds were worth as much as the $40,000 once offered for them, then this very skimpy evidence supports a figure closer to the commission's figure than to that of the taxpayer. The lease from Paragon Packing Co. was not offered nor was it detailed sufficiently to make clear its terms and its reflection of value. No market data—or even evidence of its nonexistence—was offered.

The only evidence of alleged value offered by the taxpayer was the testimony of the administrator concerning long negotiations with two packing companies, one which stood to lose a valuable crop and much improvement expense if it lost out and the other which was trying to freeze the first one out of the area. Though a contract (Exhibit 1) with the former was entered into ten months after the decedent's death, it was not carried out. Its terms are such that the only certain payment to the estate is $5,000 for one-half the shares. At best it might be some support for a figure of $10,000.

The only other contract was not entered into until 1954, seven years later, and is too remote. Offers of $10,000, $15,000, and $25,000 were rejected in 1948, 12 months after decedent's death and are some evidence of a value higher than $4,500.

The evidence establishes a value greater than $4,500 but it fails to establish any particular value. It leaves the court with the feeling that it can't get there from

here. The Oregon Tax Court is a court of justice. ORS 305.405. It is not a psychic seance. As any court, it can only act on the evidence which is presented to it. If, as here, much that should be offered is not, it must presume that it is adverse to the party who should offer it. ORS 41.360. This, unfortunately, applies to both parties to this case.

## REMAND TO COMMISSION

Under the Oregon Tax Court Act (sec 20, ch 533, Oregon Laws 1961; ORS 305.435), this court is authorized to "affirm, reverse, modify or remand the order of the commission." Following the federal procedure, in a case in which the taxpayer has overcome the presumption, shown the additional assessment to be in error, but failed to establish the proper amount of tax, this court would remand the assessment to the commission. *Helvering v. Taylor,* 293 US 507, 55 S Ct 1934, 14 AFTR 1194 (1935); *Federal National Bank of Shawnee, Oklahoma v. Commissioner,* 180 F2d 494, 39 AFTR 25 (CCA 10 1950). The federal rule as stated for the Supreme Court by Mr. Justice Butler (*Helvering v. Taylor, supra,* 55 S Ct at 290-1, 14 AFTR at 1197-8), is:

> "We find nothing in the statutes, the rules of the Board or our decisions that gives any support to the idea that the Commissioner's determination shown to be without rational foundation and excessive will be enforced unless the taxpayer proves he owes nothing or, if liable at all, shows the correct amount. While decisions of the lower courts may not be harmonious, our attention has not been called to any that persuasively supports the rule for which the Commissioner here contends.
>
> "Unquestionably the burden of proof is on the taxpayer to show that the commissioner's deter-

mination is invalid. Lucas v. Structural Steel Co., 281 U.S. 264, 271, 50 S.Ct. 263, 74 L.Ed. 848; Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184; Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212. Frequently, if not quite generally, evidence adequate to overthrow the Commissioner's finding is also sufficient to show the correct amount, if any, that is due. See, e.g., Darcy v. Commissioner (C.C.A.) 66 F.(2d) 581, 585. But, where as in this case, the taxpayer's evidence shows the Commissioner's determination to be arbitrary and excessive, it may not reasonably be held that he is bound to pay a tax that confessedly he does not owe, unless his evidence was sufficient also to establish the correct amount that lawfully might be charged against him. On the facts shown by the taxpayer in this case, the Board should have held the apportionment arbitrary and the Commissioner's determination invalid. Then, upon appropriate application that further hearing be had, it should have heard evidence to show whether a fair apportionment might be made and, if so, the correct amount of the tax. * * *"

In view of the statute and the admonition of *Ruth Realty Co. v. State Tax Commission, supra,* to conform to the federal procedure, this procedure would be followed here in the normal case.

## CLEAN HANDS DOCTRINE

But this rule does not apply to this case. This court is required by statute to conform "as far as practical, to the rules of equity practice and procedure in this state." ORS 305.425. In the equity courts of this state, relief will be denied to the party who comes before the court without clean hands. *Taylor v. Grant,* 204 Or 10, 23-27, 270 P2d 479, 279 P2d 1037, 281 P2d 704 (1955), and the authorities therein discussed. Most

correctly, the full effect of this doctrine has been applied in tax cases. *Reid v. Multnomah County,* 100 Or 310, 328, 196 P 394 (1921). As pointed out in *Taylor v. Grant, supra,* the doctrine of clean hands is not invoked for purposes of retribution or punishment nor is it strictly a defense. Rather it "is invoked on grounds of public policy and for the protection of the integrity of the court."

The evidence in this case shows beyond doubt that the taxpayer filed a supplemental inventory setting forth a value of the stock here in question on the date here in question at a figure which he knew to be incorrect for the purpose of avoiding inheritance tax liability, which at the time of the filing of the inventory could not be paid. It shows that the figure was chosen to keep the total value of the estate below $10,000 and to mislead a court of this state into determining that no inheritance tax was due from the estate. It shows that, within seven days after verifying that report, the administrator entered into a contract negotiated over a long period of time for the sale of one-half of that stock for very substantially more than $4,500. It shows that no correction of the inventory has been made, that no correction of the inheritance tax liability has been made, and that a final return seeking the closing of the estate was filed shortly after the filing of the inventory. In other words, the estate was perfectly happy to mislead the probate court and to avoid inheritance tax by claiming a value of $4,500, but now that the shoe is on the other foot, the administrator seeks relief from this court by asking it to ignore his verified statement and to help him avoid his income tax liability too.

The doctrine of clean hands only applies when

the inequitable conduct is connected or related to the matter in which the relief is sought. *Taylor v. Grant, supra,* at 24. In this case the connection and relation is clear. The victim of the inequitable conduct was the State of Oregon. It was this conduct which was the proximate cause of the assessment here in dispute.

This court is not impressed with the protestations of plaintiff's counsel that a proper inheritance tax return will be filed after this case is closed. This court is well aware of the desirable result from the taxpayer's viewpoint of trying for a low value of this stock for inheritance taxes and a high one for income taxes. However, as noted above, the clean hands doctrine is not invoked as a form of tax collection. Collection of revenue is the concern of the defendants and the State Treasurer. Being a general trial court, as is the Circuit Court for Multnomah County, this court is concerned with the integrity of the courts in the taxing process and with the public policy which must maintain such integrity.

■ In invoking this equitable doctrine, this court is not unmindful of the doctrine's limitations. *Taylor v. Grant, supra,* at 25. Obviously, it should not be used to defeat justice. Whether the same result would have obtained in this case had the plaintiff produced evidence clearly establishing a value for the shares at or near that contended for by him has to remain without answer. Presumably, where substantial injustice would result, this court, following the precepts of equity, would modify the application of the doctrine. However, this is not the case here. Because of the lack of evidence, it cannot be said that an injustice is being done by denying relief to the plaintiff. For all this court knows, the value of $4,500 would be

established upon a thorough presentation of all evidence touching upon value.

Relief is denied to the plaintiff under this doctrine. A citizen is not relieved of his legal and moral responsibility to deal fairly just because he is dealing with his government and the subject is taxes. Under our legal system and under our system of self-government in taxation the citizen is presumed to act fairly and honestly. He cannot fail to meet this standard and still invoke this court's powers.

At the time of filing its brief, the commission attached to it a document which it sought to have this court consider. This method of presenting evidence is improper. The document was neither read nor considered by the court.

A decree will be entered herein under Rule 31, denying any relief to the plaintiff and denying costs to either party.

Dated this 31st day of August 1962.