Argued and submitted August 1, 1994, reversed and remanded on appeal; reversed in part and otherwise affirmed on cross-appeal July 12, petition for review denied November 21, 1995 (322 Or 360)

Kay E. BALLINGER,
*Appellant - Cross-Respondent,*

*v.*

KLAMATH PACIFIC CORPORATION,
an Oregon corporation,
Robert Stewart,
*Respondents - Cross-Appellants,*

*and*

Michael PEARCE
and Kevin Mahoney,
*Respondents.*

(9002597CV; CA A77171 (Control))

Margaret A. SUTFIN,
*Appellant - Cross-Respondent,*

*v.*

KLAMATH PACIFIC CORPORATION,
an Oregon corporation,
Robert Stewart,
*Respondents - Cross-Appellants,*

*and*

Michael PEARCE
and Kevin Mahoney,
*Respondents.*

(9002598CV; CA A77172)
(Cases Consolidated)

898 P2d 232

Kim E. Hoyt argued the cause for appellant - cross-respondent Kay E. Ballinger. With her on the briefs were William D. Brandt and Ferder, Ogdahl, Brandt & Casebeer.

Don A. Dickey argued the cause for appellant - cross-respondent Margaret A. Sutfin. With him on the briefs were Con P. Lynch, Marcie R. McMinimee, Kathryn Clarke, Rick T. Haselton and Douglas, Dickey & Lynch.

Jeffrey M. Batchelor argued the cause for respondents - cross-appellants. With him on the briefs were Paula A. Barran, Scott J. Fortmann, Lane Powell Spears Lubersky, Alan M. Scott and Galton, Scott & Colett.

Alan M. Scott argued the cause for respondents. With him on the brief were Galton, Scott & Colett, Jeffrey M. Batchelor, Paula A. Barran, Scott J. Fortmann and Lane Powell Spears Lubersky.

Before Deits, Presiding Judge, and Riggs and Edmonds, Judges.

RIGGS, J.

Edmonds, J., concurring in part; dissenting in part.

**RIGGS, J.**

Following a trial without a jury on plaintiffs' actions to recover for unlawful employment practices (sex discrimination), battery, intentional infliction of emotional distress and common law wrongful discharge, plaintiffs in this consolidated appeal assign error to the trial court's entry of judgment for defendants on the unlawful employment practices claim. That judgment was based on the court's conclusion that, although plaintiffs had been subjected to discrimination in the form of sexual harassment, in violation of ORS 659.030(1)(b), they were not entitled to equitable relief or attorney fees, because they had not made a "reasonable effort" to resolve the problem before leaving their employment. Defendants Stewart, Pierce and Mahoney cross-assign error to the trial court's ruling that they are "employers," for purposes of plaintiffs' unlawful employment practices claim. Plaintiff Ballinger also assigns error to the entry of judgment for defendants on her claim of wrongful discharge. On cross-appeal, defendant Klamath Pacific Corporation (KP) assigns error to the denial of its motion to dismiss plaintiff Sutfin's claim of intentional infliction of emotional distress on the ground of claim preclusion, and to the trial court's ruling that KP is vicariously liable for the intentional torts of its employees, defendants Pearce and Mahoney. Defendant Stewart cross-appeals the denial of his request for attorney fees. We reverse on the appeal. On the cross-appeal, we affirm in part and reverse in part.

The following is a summary of the trial court's factual findings with respect to plaintiffs' claims. KP is a corporation that is engaged in the business of road construction. During 1988 and 1989, it employed the two female plaintiffs as flaggers. Stewart is the president of KP and owns 52 percent of its shares. Pearce is one of KP's foremen; he directs certain employees in their daily tasks and has the authority to fire employees. However, firing decisions must be justified to Stewart, who retains veto power. Plaintiffs were directly supervised by Pearce and occasionally by defendant Mahoney, a male coworker who acted as supervisor in Pearce's absence. Pearce, Mahoney, Sutfin, Ballinger and another individual formed a work group that was referred to as the "dirt crew."

Plaintiffs' work environment was sexually hostile. Pearce and Mahoney occasionally touched or rubbed plaintiffs' breasts and buttocks, repeatedly referred to sexual intercourse as "boinging" or "boinking," and asked plaintiffs if they wanted to "boing" or "boink." When Sutfin's children were on the job site, Pearce told her that he was going to tell her children how to "boing," and both Pearce and Mahoney made remarks suggesting that Sutfin's children were "boinging" each other. Mahoney told Sutfin that her two aunts, who are Catholic nuns, "were probably boinging the priests." Pearce told Sutfin that she was not a woman until she "did it" until it hurt. In front of others, Mahoney showed Sutfin a magazine centerfold of a nude woman posed with a finger in her mouth and a finger in her vagina. Mahoney made gestures to Sutfin with his mouth and fingers, referencing cunnilingus. Mahoney also grabbed his crotch, thrust his hips and made gestures with his hands indicating the size of his penis, asking Sutfin if she "liked something like this." He rubbed his throat with his hand and spit a fluid from his mouth, simulating masturbation and ejaculation. Sutfin neither welcomed nor consented to the sexually offensive and hostile conduct. Although Ballinger joined in some of the ribald conduct of Pearce and Mahoney[1] and joined in the telling of adult or sexual jokes, some of the sexually hostile conduct directed toward Ballinger was unwelcomed by her.[2] Pearce was aware of Mahoney's conduct, and during all of these events, Pearce was the foreman of the dirt crew.

As flaggers, plaintiffs' work duties included setting up, knocking down and moving signs. In 1989, they became dissatisfied about their level of compensation for moving signs. In August 1989, Pearce was absent from the job site for a few days because of a family emergency. In his absence, plaintiffs were supervised by Mahoney, who noticed that they were recording an extra 30 minutes on their time cards for

[1] The court found that Ballinger had on one occasion distributed to Sutfin, Pearce and Mahoney pieces of anatomically correct candy in the shape of penises, breasts and buttocks.

[2] Ballinger testified that Pearce encouraged Mahoney to touch her and Sutfin's breasts and tell him which of the women's breasts were firmer. She also testified that Mahoney placed a cattail in his pants to simulate an erection, asked her to find out if a dead cat tasted like "pussy," and asked her to tell him her bra size. Finally, she testified that both Pearce and Mahoney referred to plaintiffs as "dumb women," "whiny baby" and "bitch."

moving signs, regardless of the amount of time actually spent on that activity. Mahoney reported this to Pearce upon his return and Pearce advised plaintiffs that the practice must stop. Considerable friction developed between members of the dirt crew.

On August 10, 1989, Sutfin radioed the office and asked to meet with Stewart or his wife, who worked in the office. On that same day, an argument broke out between Pearce and Sutfin regarding Sutfin's comments to a county inspector about the placement of signs. They both became angry and argued with raised voices. Ballinger joined in and, at one point, plaintiffs called Pearce a liar. Ballinger encouraged Sutfin to leave the area, because they had an appointment to meet with Stewart. Pearce cautioned them not to leave or they "wouldn't be back." Both plaintiffs left, believing that they had been fired. By the time plaintiffs reached the KP office, Pearce had already spoken with Stewart and told him that he, Pearce, did not want plaintiffs on his crew because they complained, were insubordinate, and did not want to move signs.

Before August 10th, Stewart had never heard of any problems or friction among the dirt crew members, and plaintiffs had consistently reported to the management at KP that their job conditions were fine.[3] Stewart listened to Pearce's report and decided to affirm Pearce's recommendation to fire plaintiffs. When plaintiffs arrived at Stewart's office, they were agitated and complained about their compensation for moving signs. After several minutes, they began to complain about Mahoney's sexual misconduct toward them. Stewart believed that plaintiffs were angry about losing their jobs and that they were making the allegations merely to harm Mahoney. In the course of their conversation, Sutfin informed Stewart that Mahoney had told a county employee, Whitlatch, that Mahoney wanted to have sex with Whitlatch's 14-year-old daughter. Stewart became angry. He sent plaintiffs home to pick up and return radio chargers that belonged to KP, and while they were gone he telephoned

---

[3] Sutfin testified that she felt she could not complain to upper management. She also testified that, because her immediate supervisor was participating in the harassment, she feared that his status in the company would cause her to be ignored or subjected to retaliation if she did complain.

Whitlatch, who confirmed that Mahoney had made the offensive comment. After speaking with Whitlatch, Stewart decided that he would fire Mahoney and reinstate both plaintiffs, if they would accept reinstatement. He contacted Pearce to notify him that Mahoney was to be fired. When plaintiffs returned to the office about 45 minutes later, Stewart asked if they would return to work with Pearce. On the basis of Stewart's promise that Mahoney would not be there when they returned to work, plaintiffs accepted their jobs back. Stewart told Pearce that plaintiffs had been reinstated and directed Pearce to stay away from them on the job.

The following day, Pearce threatened Sutfin that if she maintained her allegations, the situation would get "ugly and messy." The trial court found that Pearce's statement was intended to frighten Sutfin into withdrawing her allegations of sexual harassment, and that it was made (1) to protect his job; (2) to help his friend, Mahoney, regain his job; and (3) to help KP avoid any claims that Sutfin might bring against it. Following Pearce's threat, Sutfin became physically ill and vomited. The next day, August 12, Mahoney telephoned Sutfin and threatened to commit suicide. Sutfin again became physically ill and vomited. The following week, plaintiffs were supervised by Mike Voight, who observed no problems with their job performance or attitude.

On August 15, 1989, Mahoney met with Stewart. Stewart was angry with Mahoney and told him that he should make amends to anyone he had offended. Later that day, Stewart learned that Mahoney had apologized to Whitlatch. He confirmed the apology and asked if Whitlatch would have any problems working with Mahoney if he returned. Whitlatch said that he would not.

Stewart decided to reinstate Mahoney. However, in order to keep the situation under control "until tempers cooled and he could investigate further," Stewart assigned Mahoney to work with Pearce on a part of the road project that was five or six miles away from the site where plaintiffs were flagging for Voight. Stewart did not believe that there would be any contact between the plaintiffs and Mahoney, due to the topography and the distance that would be between them. A separate set of flaggers was assigned to work with

Pearce and Mahoney, and Stewart told Pearce that he was to see that Mahoney "kept his nose clean."

On August 16, 1989, Ballinger arrived at her work site and saw Pearce and Mahoney drive by in a truck. No words or gestures were exchanged. Ballinger correctly assumed that Mahoney had been rehired. She told Sutfin, and the two walked off the job, believing that Stewart had reneged on his promise. At trial, Sutfin testified that, when she learned that Mahoney was back on the job, she reflected on the fact that she and Ballinger

"had talked to [Stewart] extensively about the situation, what had happened. He told us if we had any problem — more problems on the job, come and talk to him, but next time make sure it was a real problem. I felt that was a major problem when I came and talked to him. He didn't want us in there whining and tattling. Anyway, I sat there, I — and that was it. I mean, [Mahoney] was out there on the job again. [Mahoney] was working there; I wasn't going to work there any more. It was just one more slap in the face."

Pearce and Mahoney were not subjected to any type of disciplinary action by their employer for their conduct toward Sutfin and Ballinger. The trial court found that KP had not adequately addressed their conduct, and concluded that

"[t]he failure of [KP] to take appropriate action was a sign to those two employees, and perhaps others, that the company did not consider the issue of sexual discrimination at [KP] to be a serious problem, or one that the company would take seriously."

Plaintiffs brought these actions alleging violations of ORS 659.030, specifically, sex discrimination in the form of harassment, wrongful discharge and wage discrimination.[4] They also brought claims for intentional infliction of emotional distress, common law wrongful discharge, and battery. All of the claims were brought against Pearce and Mahoney directly, and against Stewart and KP under the doctrine of *respondeat superior*. The trial court ruled in favor of both

---

[4] On the wage discrimination claim, the trial court held that no male flaggers employed by KP were compensated at any higher rate than plaintiffs for moving signs, and that plaintiffs' compensation was based not on their sex, but on the nature of their jobs as flaggers. Accordingly, it ruled in favor of defendants on that claim. On appeal, plaintiffs do not assign error to that ruling.

plaintiffs on their battery claims against all defendants except Stewart, and ruled in favor of Sutfin on her intentional infliction of emotional distress claims against all defendants except Stewart. It ruled in favor of defendants on plaintiffs' common law wrongful discharge claims.

■    With regard to plaintiffs' claims under ORS 659.030, the trial court concluded that plaintiffs had been sexually harassed and, therefore, subjected to sex discrimination in violation of the statute. *See* OAR 839-07-550 (sexual harassment is a form of sex discrimination). However, relying on *Thorne v. City of El Segundo*, 802 F2d 1131 (9th Cir 1986), the court held that plaintiffs were not entitled to equitable relief, because they had not made "a reasonable effort to deal with the discrimination" before leaving their employment. Both plaintiffs assign error to that ruling. We review *de novo* plaintiffs' statutory claim. ORS 659.121(1); *Wincer v. Ind. Paper Stock Co.*, 48 Or App 859, 618 P2d 15 (1980); ORS 19.125(3).

■    ORS 659.030 provides, in part:

"(1)    [I]t is an unlawful employment practice:

"(a)    For an employer, because of an individual's * * * sex, * * * to refuse to hire or employ or to bar or *discharge* from employment such individual. * * *

"(b)    For an employer, because of an individual's * * * sex, * * * to *discriminate* against such individual *in compensation or in terms, conditions or privileges* of employment." (Emphasis supplied.)[5]

---

[5] The dissent goes to great lengths to segregate plaintiffs' subsection (a) claims from their subsection (b) claims, and goes so far as to state, incorrectly, that plaintiffs do not allege that defendants' conduct before August 10th was the basis for their claim for relief under the statute. The dissent's arguments ignore the fact that plaintiffs' subsection (a) claim of wrongful discharge and their subsection (b) claim of hostile environment are alternate theories of recovery. They are also interrelated claims, to the extent that plaintiffs' entitlement to recover for wrongful discharge under subsection (a) required that they establish that the harassment (a violation of subsection (b)) gave rise to their constructive discharge. Appropriately, plaintiffs do not seek a double recovery of lost wages — that is, lost wages for the violation of subsection (a) and *additional* lost wages for the violation of subsection (b). Their calculation of lost wages begins as of August 16, 1989, the date when they left their employment.

By placing undue emphasis on the date that Mahoney was fired and the harassment-free environment that plaintiffs enjoyed thereafter, the dissent is able to say that plaintiffs could not have felt forced to quit on August 16th. However, plaintiffs' sex discrimination complaint rests on the many events that had occurred

ORS 659.121(1) provides:

> "Any person claiming to be aggrieved by an unlawful employment practice prohibited by * * * ORS 659.030 * * * may file a civil suit in circuit court for injunctive relief and the court may order such other *equitable relief as may be appropriate, including but not limited to* reinstatement or the hiring of employees with or without *back pay*.[6] * * * In any suit brought under this subsection, the court may allow the prevailing party costs and reasonable attorney fees at trial and on appeal." (Emphasis supplied.)

Neither of the quoted statutes require that, in order to receive equitable relief, costs and attorney fees, victims of sex discrimination in the workplace must establish that they made a "reasonable effort to resolve the conflict" before leaving their jobs. Nor has any Oregon appellate court[7] ever implied the existence of such a standard *as a prerequisite to receiving equitable relief* for employment discrimination, and we decline to do so now.

■■  Requiring that a victim of sexual harassment make a "reasonable effort to resolve the conflict" suggests that the victim must confront the harasser or complain to a person with authority, or in some other way attempt to cut short or mitigate the damage that is occurring as a result of the hostile work environment. That requirement has obvious appeal in many situations. But requiring attempts at resolution could be inappropriate in a number of circumstances, including but not limited to those cases in which the harassment is so egregious that the victim feels too degraded or embarrassed to complain, or the perpetrator of the harassment is the

---

up to that point: the explicit harassment, the promise to fire Mahoney, the threats made by Pearce, the rehiring of Mahoney and Ballinger's observation of his return to work. Because of the longstanding nature of the harassment and its *cumulative* effect on plaintiffs, their ultimate decision to leave their jobs cannot be viewed in a vacuum, with reference to only those events that took place between August 10th and August 16th.

6 We note that the parties in this action use the terms "front pay," "lost wages," and "back pay" interchangeably, and no issue is raised as to whether all of those are a form of equitable relief. Under the facts of this case, "lost wages" is the most apt term.

7 We also note that *Thorne v. City of El Segundo*, 802 F2d 1131 (9th Cir 1986), the federal case on which the trial court relied, was not a sexual harassment case, but rather involved a claim of "failure to promote."

victim's supervisor, or the victim's supervisors know that harassment is occurring and take no action to stop it. In the universe of circumstances that exist in these cases, it could be a further abuse to require the victim to make an effort to resolve the conflict before leaving the job. The dissent's position — that a harassed employee must take steps to improve her or his situation before quitting and suing for employment discrimination — is an attempt to import into ORS chapter 659 discrimination claims a standard that is analogous to the one that was considered and rejected by the Supreme Court in *Bratcher v. Sky Chefs, Inc.*, 308 Or 501, 783 P2d 4 (1989). There, the issue was whether an employee claiming wrongful discharge "must show that a reasonable person in the employee's position would consider the working conditions so unacceptable as to force a resignation." *Id.* at 506. The court held that "it is immaterial what some other hypothetical employee would have done[.]" *Id.* Likewise, there is no Oregon precedent for requiring that a particular employee must establish that her response to the harassment was the same response that some hypothetical, "reasonable employee" would make, before concluding that she is entitled to equitable relief for sex discrimination that took the form of inferior compensation, terms, conditions or privileges, ORS 659.030(1)(b). The dissent's belief that plaintiffs in the present case should have talked to Stewart again, before quitting, is not a proper basis for importing new requirements into claims that are brought under ORS 659.030(1). Plaintiffs either establish discrimination or they do not. Here, they did. Once discrimination is established, plaintiffs are entitled to relief under ORS 659.121.[8]

---

[8] *Additional support for the holding that there is no* "reasonable effort to resolve the conflict" *requirement in Oregon is found in the single reference to* "Employee Responsibility" *in the Oregon Administrative Rules that relate to sex discrimination: "Generally an employee subjected to sexual harassment should report the offense to the employer." OAR 839-07-565. (Emphasis supplied.) That is a substantially lower standard than requiring that the employee attempt to resolve the conflict.*

The dissent is seemingly confused when it states that plaintiffs' allegations "demonstrate that their claims could not be under ORS 659.030(1)(b). Consequently, their claims are under ORS 659.030(1)(a) by operation of law * * *." 135 Or App at 466. That approach ignores that plaintiffs brought their claims under both subsections (b) and (a), in that order; the trial court expressly resolved those claims under those subsections; and the parties argue about the requirements of each subsection on appeal. We resolve the subsection (b) issue by holding that "reasonable effort" need not be pled nor proven to prevail on a subsection (b) claim and to obtain relief under ORS 659.121.

Even if the legislature had enacted a different ORS chapter 659 — one that included the dissent's additional requirement that a plaintiff must make reasonable efforts to resolve discrimination before she or he is entitled to relief, that requirement would have been met in the present case. Here, plaintiffs attempted to resolve the problem of harassment by notifying Stewart. Although the primary perpetrator of the harassment was fired, that firing was temporary and was not based on the misconduct that he had directed toward *plaintiffs*, and no action was taken to reprimand the supervisor. The trial court specifically found, and we too find on *de novo* review, that Stewart did not take plaintiffs' complaints seriously and that his "remedy" was inadequate.[9] Then, in the short period of

---

The dissent multiplies the problem when it suggests that plaintiffs' decision to quit could not *really* have been based on the sexual harassment, or else they would have complained to KP "earlier," 135 Or App at 468, and when they did complain, sexual harassment would have been the first item of business. *See* 135 Or App at 468. However, there is no necessary relationship between the timing of a complaint and its truth, particularly when matters of sexual harassment and job security are involved. On *de novo* review, we do not draw the same inference that the dissent does.

[9] *See* OAR 839-07-555(2) ("An employer is responsible for acts of sexual harassment by an employee * * * unless it can be shown that the employer took immediate and *appropriate* corrective action."). (Emphasis supplied.)

The dissent cites, as one of five "uncontroverted facts" in this case, that "KP took remedial action as soon as it found out about plaintiffs' complaints." 135 Or App at 458. That "fact" was anything *but* uncontroverted and, moreover, it was resolved by the trial court in a manner opposite to the dissent's position. After hearing plaintiffs' complaints, KP affirmed Pearce's decision to fire them. It fired Mahoney only after learning that he had expressed to a male county employee a sexual interest in that employee's under-aged daughter, and, after rehiring Mahoney, no disciplinary action was taken against either him or Pearce for their conduct toward plaintiffs. The trial court found that KP's purported "remedy" of moving Pearce and Mahoney to a different jobsite was inadequate, that KP had

"failed to take appropriate remedial action against defendants Mahoney and Pearce after learning of the misconduct * * * [and that KP had] failed to properly investigate the facts surrounding the allegations of sexual misconduct made against Pearce and Mahoney."

Further, the dissent states that "[t]here is no evidence that plaintiffs were sexually harassed after August 10." 135 Or App at 468. That statement improperly narrows the discussion of sex discrimination to a discussion of overt acts of harassment during a five-day period. *See* n 5, above. The trial court found that Sutfin had been subjected to threats by Pearce after she complained. When a supervisor threatens a female employee with "messy" repercussions if she does not drop her sexual harassment complaint against him and a male coworker, that is a clear example of gender-based differential treatment in the workplace.

time between Mahoney's firing and rehiring, plaintiffs' supervisor threatened to retaliate if Sutfin pursued her complaints. Finally, by failing to inform plaintiffs that Mahoney had been rehired to work at a different job site, Stewart himself created a situation in which plaintiffs understandably misconstrued Mahoney's presence as a breach of Stewart's specific promise that they would no longer have to work with Mahoney. Under these circumstances, a reasonable person could have concluded that *there was no use in taking further action*. Indeed, Ballinger testified that she felt there was nothing more she could do to resolve the situation, and she "figured if [Stewart] had rehired [Mahoney], that he must have condoned what happened."

■ In summary, the trial court correctly held that plaintiffs have pled and proven a violation of ORS 659.030(1)(b), but erred when it imposed a "reasonable effort" requirement and barred recovery of lost wages on that basis. On remand, plaintiffs may obtain equitable relief under ORS 659.121.[10] *See also* ORS 20.107 (attorney fees and costs for successful claims of illegal discrimination).

Defendants cross-assign error to the trial court's conclusion that Stewart, Pearce and Mahoney are all "employers," for purposes of the unlawful employment practice statute, ORS 659.030. They argue that KP was the only employer and that, accordingly, only KP can be held liable for sex discrimination under ORS 659.030.

ORS 659.010(6) provides:

" 'Employer' means any person * * * who in this state, directly or through an agent, engages or utilizes the personal

---

[10] Contrary to the dissent's assertions, there is no requirement in the law that this court award to a prevailing appellant the equitable relief that was unsuccessfully sought below. Indeed, there are cases in which remand is a far more appropriate disposition. In this case, the sexual misconduct occurred in 1989, the trial was held in 1992 and this appeal was argued in August 1994. Now, in 1995, six years after the fact, relief that might have been "equitable" *then* may no longer be. One example of such relief would be to require that KP hold training sessions for its employees, to educate them about what sexual harassment is and why it will not be tolerated in the workplace. It is possible that KP may have instituted such training sessions more than five years ago. Equitable relief need not take the precise form, amount or duration that a plaintiff might choose to seek; the trial court has discretion to fashion a remedy that is appropriate under the unique circumstances of each case. We remand in this case because that court erred, *as a matter of law*, when it treated "reasonable effort" as if it were a prerequisite to an award under ORS 659.121.

service of one or more employees reserving the right to control the means by which such service is or will be performed."

Stewart, as KP's president and 52 percent shareholder, had plenary authority to hire, fire, and direct the activities of his employees. Although as a general rule the corporation alone would be the entity that "reserv[es] the right to control the means by which" employee services will be performed, the trial court decided that Stewart too fell within that definition, apparently because his majority ownership of KP and his principal role in the day-to-day management of the business made him the person who actually had the power to *exercise* that "right to control."

It is also possible that the trial court based its decision on federal law. Portions of ORS 659.030 are patterned after 42 USC § 2000e ("Title VII"), *see Holien v. Sears, Roebuck and Co.*, 298 Or 76, 99, 689 P2d 1292 (1984) (remedies available under ORS chapter 659 "parallel federal Title VII remedies"), and there can be little doubt that, under Title VII, Stewart is liable as an employer.

"Title VII imposes liability on an 'employer.' The term is defined as an entity employing fifteen or more persons, and also as any 'agent' of the employer. Thus, an individual may be liable under Title VII as an 'employer' if under the circumstances that individual has acted as an 'agent' of an employer.

"* * * * *

"Nowhere in Title VII is the term 'agent' defined. Courts most commonly define the term as 'a supervisory or managerial employee to whom employment decisions have been delegated by the employer.' Employer 'liability attaches only against individuals who exercise effective control in the workplace — those persons who make or contribute meaningfully to employment decisions.'

"*The clearest case for 'employer' status exists where the employer has delegated to a general manager or upper-level supervisor the employer's traditional rights to hire, fire, and direct the work force.*"

Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 515-16 (1992) (emphasis supplied; footnotes omitted); *see also Harvey v. Blake*, 913 F2d 226, 227 (5th Cir 1990).

■    As the quoted passage reveals, the Title VII definition of "employer" differs from the ORS chapter 659 definition in one important particular: the federal definition includes "agents" to whom the highest level of supervisory authority has been delegated by the employer. In contrast, the state definition appears to *exclude* agents by limiting employer liability to those who "directly *or through an agent* * * * reserv[e] the right to control" their employees. ORS 659.010(6). (Emphasis supplied.) Under that definition, which implicitly distinguishes between employers and their agents, a corporate employer such as KP may control its employees "through an agent" such as Stewart, but the agent is not an "employer." The trial court erred in holding that Stewart fell within the definition of "employer," for purposes of the state unlawful employment practice statutes.[11]

■    As for Pearce and Mahoney, they too are not "employers," under ORS 659.010(6). Although they were authorized to supervise plaintiffs and even authorized to sign timesheets, the authority to "control" those employees was not "reserv[ed]" to them. For example, Pearce and Mahoney did not have the power to hire, did not have the final say on firing, did not have authority to sign or to withhold paychecks, were not authorized to determine which crew plaintiffs would work on, and did not possess the power to either advance or demote them to other positions within the company. The trial court erred in extending the definition of "employer" to include individuals with such limited supervisory authority.[12] On remand, plaintiffs' recovery on their statutory claim of discrimination may not be assessed against Stewart, Mahoney or Pearce.

■    Next, plaintiff Ballinger assigns error to the trial court's entry of judgment for defendants on her wrongful discharge claims, which were based on both common law and

---

[11] The dissent grossly overstates the importance of federal law in this case when it opines that ORS 659.030(1)(b) "was intended by the legislature to track Title VII." 135 Or App at 472. Although the *remedies* section of the Oregon law was, at the time of its enactment, intended to parallel federal remedies for unlawful employment practices, there are also important differences between the two laws.

[12] We note that Pearce and Mahoney would not possess the ability to carry out a court order to rehire and dispense back pay, if such a remedy were awarded plaintiffs under ORS 659.121. In fact, the trial court specifically found that those two defendants "have no control over wages or benefits paid to Plaintiffs[.]"

ORS 659.030(1)(a). The court found that neither KP nor Stewart had intended that plaintiffs be discharged on August 16, 1989, and that neither had created working conditions with the intent that plaintiff would be forced to terminate her employment. On *de novo* review of the statutory claim, we too find that KP and Stewart did not possess the requisite intent. Because the common law claim is an action at law, and there is evidence to support the trial court's findings on that claim, our review is limited to whether the legal conclusion that was reached by the trial court on the basis of those findings was erroneous. *Alsea Veneer, Inc. v. State of Oregon*, 117 Or App 42, 52, 843 P2d 492 (1992), *aff'd in part, rev'd in part on other grounds*, 318 Or 33, 862 P2d 95 (1993).

▮▮ Oregon recognizes the tort of wrongful discharge. It is well established that "a resignation may have the same effect as a discharge if the resignation is, in effect, forced by the employer." *Bratcher*, 308 Or at 503. Ballinger argues that she was constructively discharged because her employer's conduct was such that her only choices were to submit to the harassment or quit her job. *See McGanty v. Staudenraus*, 123 Or App 393, 396-97, 859 P2d 1187 (1993), *rev allowed* 319 Or 211, 876 P2d 784 (1994). Specifically, she contends that her employer's rehiring of Mahoney and its failure to take adequate remedial measures "established that it intended to force plaintiffs to leave its employment."

▮ In *Bratcher*, the Supreme Court concluded that, in order to establish a claim of constructive discharge due to unacceptable working conditions, a plaintiff must prove that the employer deliberately created or maintained those working conditions with the intention of forcing the employee to leave the employment, and that the employee left his or her employment because of the hostile working conditions. 308 Or at 506; *see also Bell v. First Interstate Bank*, 103 Or App 165, 168, 796 P2d 1226 (1990) (applying *Bratcher* to a discrimination claim brought under ORS 659.030(1)(a)). In this case, it is undisputed that Stewart took steps to improve plaintiffs' working conditions by reassigning Mahoney to a work site that would prevent his contact with plaintiffs. The trial court did not err in concluding that, because Stewart did not intend to force plaintiffs to leave their jobs, *his* conduct provided no basis for a wrongful discharge claim.

■■■■■ However, when it decided this case, the trial court did not have the benefit of our opinion in *Mains v. II Morrow, Inc.*, 128 Or App 625, 877 P2d 88 (1994), which held that employers may be vicariously liable for wrongful discharge if their *supervisors* intended to force an employee to leave:

> "An employer is liable for a constructive discharge if an employee resigns because of intolerable working conditions that a supervisor creates with the intent to force the employee to resign, and the employer is responsible for the conditions under the doctrine of *respondeat superior*." *Id.* at 629.

If a supervisor continues to sexually harass or allow harassment, it is reasonable to infer that the supervisor is deliberately maintaining working conditions that will force the employee to either submit to the harassment or quit the job. *McGanty*, 123 Or App at 396-97. If the employee resigns because of those working conditions, the employer is liable for constructive discharge. *Mains*, 128 Or App at 629. Here, the trial court found that Pearce, in his role as plaintiffs' supervisor, contributed to the sexually hostile environment in which plaintiffs worked. His responsibility for creating and maintaining that environment, in combination with plaintiffs' belief that Stewart had broken his single "remedial" promise, caused plaintiffs to believe that their only options were to submit to the harassment or quit. In sum, the trial court's wrongful discharge analysis was limited to KP and Stewart. Because it decided the case before we issued our opinion in *Mains*, it failed to consider KP's responsibility for Pearce's role in plaintiffs' resignation. In the light of *Mains*, the trial court erred in dismissing Ballinger's wrongful discharge claims.[13]

■■■■■ We turn to defendants' cross-appeal. Stewart assigns error to the denial of his request for attorney fees, contending that fees should have been awarded to him because plaintiffs'

---

[13] The dissent again misses the point when it states that Ballinger cannot prevail on her wrongful discharge claim because there "is *no* evidence that Stewart acted with the intent to force plaintiffs to quit when he reinstated Mahoney." 135 Or App at 471. (Emphasis in original.) Stewart's actions and intentions are relevant at only our first level of inquiry. The second level, discussed in *Mains v. II Morrow* but entirely ignored by the dissent, is to analyze the actions of the employer's supervisors, such as Pearce, and to determine whether *he* intended to force plaintiffs to quit.

sex discrimination claims against him were frivolous, unreasonable, or without foundation. *Payne v. American-Strevell, Inc.*, 65 Or App 265, 670 P2d 1065 (1983). The trial court specifically found that those claims "were not frivolous or brought for harassment purposes." Stewart nonetheless argues that "no rational lawyer would argue seriously that [Stewart]," as distinct from KP, was plaintiffs' "employer." However, given that both KP and Stewart fall within the definition of "employer," as that term is used in Title VII, and given that federal law was the basis of the trial court's conclusion that plaintiffs were not entitled to recover on their sex discrimination claims — a ruling that Stewart urges us to affirm — we find no error in the trial court's refusal to award Stewart attorney fees. We agree with the trial court that it was not "frivolous" or irrational for plaintiffs to argue that Stewart should be considered an "employer" for purposes of the unlawful employment statutes. Although we have concluded that plaintiffs' argument in that regard does not prevail under Oregon law, our determination on that issue of first impression does not affect the correctness of the trial court's findings about the propriety of plaintiffs' motive in bringing their sex discrimination claims against Stewart.

■ Next, KP assigns error to the trial court's ruling in favor of Sutfin on her emotional distress claim.[14] It contends that that claim is "barred under claim preclusion principles," because plaintiffs originally filed this case in federal court, alleging battery, intentional infliction of emotional distress (IIED), wrongful discharge and violations of Title VII and the Equal Pay Act, and Sutfin did not appeal when that action was dismissed. KP neglects to mention that, after the court disposed of the federal law claims, it declined to exercise pendent jurisdiction over the state law claims and dismissed those claims without prejudice. Accordingly, the state claims are not precluded and the trial court did not err in its ruling on Sutfin's IIED claim.

KP's final assignment on cross-appeal challenges the trial court's legal conclusion that KP was vicariously liable for

---

[14] The court found that the sexually hostile environment, and the threats made by Pearce and Mahoney between August 10 and August 16, were intended to cause and in fact did cause Sutfin to suffer extreme emotional distress for which she was entitled to recover.

the intentional torts of Pearce and Mahoney, specifically, their acts of battery and IIED. KP relies on *Chesterman v. Barmon*, 305 Or 439, 753 P2d 404 (1988), in which the court explained:

> "Under the doctrine of *respondeat superior*, an employer is liable for an employee's torts when the employee acts within the scope of employment. * * *
>
> "Three requirements must be met to conclude that an employee was acting within the scope of employment. These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform." *Id.* at 442.

It is undisputed that the acts in this case occurred "within the time and space limits authorized by the employment." KP's contention is that the harassment, which resulted in IIED and battery, was not motivated by a desire to serve KP and was not the kind of act which the two defendants were hired to perform.

We have held that work place sexual harassment that results in IIED and battery is motivated by purely "personal" desires that are unrelated to serving one's employer. *See, e.g., Carr v. US West Direct Co.*, 98 Or App 30, 36, 779 P2d 154, *rev den* 308 Or 608 (1989); *but see Mains*. Although the trial court in this case specifically found that the threats Pearce directed toward Sutfin on the day after Mahoney's firing were, among other things, made for the purpose of helping KP avoid any claims that Sutfin might bring against it, it did *not* find that attempting to provide such "protection" for KP was conduct "of a kind which [Pearce] was hired to perform." *Chesterman*, 305 Or at 442. That is, Pearce's behavior was neither related to a job responsibility nor conduct that KP even tacitly condoned. The third requirement of *Chesterman* having not been met, the trial court erred in concluding that KP was vicariously liable for the battery and IIED committed by Pearce and Mahoney toward plaintiffs.

Reversed and remanded on appeal; on cross-appeal, judgment against Klamath Pacific Corporation on claims for

battery and intentional infliction of emotional distress reversed; otherwise affirmed.

**EDMONDS, J.,** concurring in part and dissenting in part.

The majority holds that plaintiffs have pled and proven a violation of ORS 659.030(1)(b), and that the trial court erred when it denied damages to plaintiffs because they had not made a reasonable effort to work out their problems with defendant Klamath Pacific (KP). Accordingly, the majority remands for the trial court to consider what "equitable relief" to which plaintiffs are entitled.

First, the majority errs by remanding. There is no reason why, on *de novo* review, this court can't make that decision. Second, there are substantive reasons why the majority's opinion is wrong. Those reasons break down into two major classifications: (1) The majority incorrectly analyzes the legal import of uncontradicted facts; (2) the majority erroneously construes the applicable statutes and their underlying policies in light of the nature of the claims made by plaintiffs. Thus, I find myself dissenting in part not because I condone Pearce and Mahoney's behavior, but because I believe that the majority's result is not a just result for the parties and sends the wrong legal signals to the bench and Bar.

## THE FACTS

The picture painted by the majority is of two female workers who were sexually harassed by a male supervisor and a male worker over a prolonged period of time until they were forced to quit rather than endure more of the same treatment. If there is one thing that I agree with the majority about, it is that workers of either sex should not have to endure the kind of conduct in the work place perpetrated by Pearce and Mahoney to the extent that it is unwanted and unsolicited by coworkers.[1] No person should have to endure that kind of uninvited harassment and abuse in any work place, including male-dominated construction sites. As the trial court found, there is evidence of sexual harassment. However, when the entire record in this case is considered, it

---

[1] In this case, there is no evidence that plaintiffs invited any sexual touching.

is evident that this case is about more than a sexually hostile work environment. The majority's failure to consider the "rest of the story" results in a distorted legal analysis that is painfully oblivious to the reality of what occurred in this case.

This case is also about an employer's good faith attempt to eliminate a sexually hostile environment once it became aware of it, the plaintiffs' disagreement with those efforts, and whether it is consistent with the policy of the law to reward plaintiffs with an award of back pay or any other equitable relief when they were unwilling to discuss their concerns further after the employer took remedial action. That means that the proper analysis must consider not only the nature of the work environment, but also what remedy is commensurate with what occurred factually. The majority attaches its label of approval on plaintiffs' disagreement with how the employer chose to address the discrimination in the work place that allegedly led them to quit their jobs. The trial court correctly recognized what the majority has not; the bottom line of this case is that it is inequitable to award plaintiffs any relief on their ORS 659.030 claims because they walked off the job without giving the employer a chance to explain its reasons for the reinstatement of Mahoney.

There are certain uncontroverted facts in this case that when considered together make the majority's result inequitable. The first is that, before August 10, 1989, plaintiffs had never made any complaint to Klamath Pacific (KP) about sexual harassment even though it had been ongoing allegedly for two construction seasons. The second is that there is persuasive evidence that before August 10, 1989, plaintiffs had condoned and participated in the conduct which they now claim created a sexually hostile environment. Third, none of the principals of KP was aware of any purported discrimination against plaintiffs until August 10, 1989. The fourth is that KP took remedial action as soon as it found out about plaintiffs' complaints. The fifth is that plaintiffs never gave KP's remedy a chance to work. These facts are important because they lend understanding to what prompted the trial court's conclusion that plaintiffs were not entitled to damages on their claims based on sexual harassment.

A proper understanding of all of the facts begins with the plaintiffs. The evidentiary record does not portray them

as easily intimidated by dominating male coworkers. In fact, the antithesis is true. It is evident that plaintiffs are assertive, confident, even combative people who functioned well in the robust environment of the construction world. While that fact does not justify uninvited sexual harassment, it is one fact to consider in assessing the credibility of plaintiffs' claim that they were forced to quit by the way in which KP responded to their complaints. Moreover, plaintiffs were not shy about making complaints to their immediate supervisors about other work conditions before August 10. Plaintiffs worked almost two full construction seasons with Mahoney and Pearce before they quit. They drank beer with Mahoney and Pearce after work, participated in food and water fights with them, physically scuffled with them in an amiable fashion, and engaged in other activities of general camaraderie apparently considered as appropriate by all involved. On some occasions, Ballinger's husband was present during these activities. By all accounts, plaintiffs were friends with Pearce and Mahoney even though sexual banter was an ongoing aspect of the work place. They were the ''dirt crew'' or as Stewart called them, his ''A Team''; perhaps named after a popular television show involving male and female characters who participated in paramilitary activities.

Illustrative of the relationships among the dirt crew is this finding made by the trial court:

"18. At the end of July or early in August, 1989, Mahoney and Sutfin started a food fight in which most members of the crew participated during their lunch hour. During the food fight, Sutfin held on to Mahoney and rubbed a handful of cherries onto his shoulder. Defendant Pearce threw yogurt in Plaintiff Sutfin's hair. A few days later Ballinger concocted an elaborate practical joke on Mahoney to get revenge for the food fight. She purchased the same brand yogurt he regularly ate, cooked a gelatin mixture to replace the yogurt, and placed it in the container along with a number of leeches which she had asked [another person] to catch on the job site. She surreptitiously replaced his yogurt with this concoction and reported the joke that morning to the other crew members and county employees. Mahoney was angry at the joke and later referred to Ballinger one time as the 'leech tornado bitch.' "

Other findings by the trial court portray a similar sense of relationship among the crew members. On one occasion, Sutfin supplied the beer for the evening, and the dirt crew and some of their spouses engaged in the telling of adult or sexual jokes. On another occasion, Ballinger distributed pieces of candy in the shape of sexual organs to Pearce, Mahoney and Sutfin.

The overriding factual inquiry in this case is whether plaintiffs were forced to quit on August 16, 1989, to avoid future sexual harassment or whether they quit for other reasons. Before August 10, the trial court found that during 1989, Sutfin had become "dissatisfied because her vehicle incurred paint scratches when she used it to move signs." She believed that she should receive additional pay because of the damage to her car. Also, both plaintiffs were unhappy about their rate of compensation for moving signs and wanted to be paid more. In early August 1989, Mahoney, acting in the absence of Pearce, refused to allow plaintiffs to charge for an extra half hour for the moving of signs. As a result, both plaintiffs became angry and considerable friction had developed on the dirt crew by August 10.

The trial court tells us what happened on August 10 that triggered plaintiffs' decision to quit:

"28. August 10, 1989, was a hot day and tempers were frazzled on the dirt crew by the end of the day. A blow-up ensued when a County inspector approached Pearce to talk about sign placement. Pearce was angry that Sutfin had gone to the County without talking to him about the signs. Sutfin believed that Mahoney had instructed her to talk to the County. Pearce and Sutfin both became angry and argued with raised voices. While they were arguing, Ballinger came up and joined the arguments. At one point, both plaintiffs called Pearce a liar. Ballinger encouraged Sutfin to leave the area because they had an appointment to meet with Stewart. Pearce cautioned the flaggers not to leave or they 'wouldn't be back.' The plaintiffs left believing they had been fired.

"29. Plaintiffs did not go directly to the Klamath Pacific office. They made a stop at a local store where Ballinger bought a beer. By the time the plaintiffs reached the Klamath Pacific offices, Pearce and Mahoney had already spoken with Stewart and Pearce had told him he did not want the plaintiffs on his crew because they fought him and complained and did not want to move the signs.

"30.   Prior to August 10, 1989, Stewart had never heard of any problems or friction among the dirt crew members. He was surprised at Pearce's report because his past experience with the crew had been such that he called the crew his 'A' team. Pearce had never before fired anyone. He listened to Pearce's report and trusted Pearce's assessment (in light of Pearce's experience and work record), and determined to affirm Pearce's decision to remove the plaintiffs from the dirt crew. Removal from the crew would normally mean termination of employment.

"31.   Shortly after Stewart spoke to Pearce, the plaintiffs arrived at his office. Stewart was aware that one of them had been drinking, although he did not know which. Plaintiffs spoke to him in an agitated fashion, *complaining about money*. They said that they did not want to move signs for free, to which Stewart responded, 'Why not?,' a question he intended to be a joke since he did not believe they were moving signs for free. Sutfin then began complaining *about moving the signs in her vehicle because it was damaging the paint job*. After several minutes of complaint about money, both plaintiffs began to complain about Mahoney. Plaintiffs complained in general terms about Mahoney's *alleged sexual misconduct* on the job. Initially, Stewart believed Plaintiffs were angry about losing their jobs, and were making the allegations merely to harm Mahoney. Stewart at first did not believe the allegations by Plaintiffs.

"32.   In the course of the conversation, Sutfin asked Stewart if he knew what Mahoney said to [a county employee]. Stewart did not, and Sutfin repeated a comment about Mahoney sleeping with [a county employee's] teen-aged daughter. Stewart was angry about the comment. He sent both plaintiffs to pick up the radio chargers that were at Sutfin's home. While they were gone, he telephoned [the county employee] and confirmed that Mahoney had made an offensive comment to him.

"33.   After speaking to [the county employee], Stewart decided he would reinstate both plaintiffs *if they were willing to accept reinstatement*, and he contacted Pearce to notify him that Mahoney was terminated.

"34.   When the plaintiffs returned to the office about 45 minutes later with the radio chargers, Stewart met them at the door of the office and asked if they would return to work with Pearce. *He said they would not have to work with Mahoney. The plaintiffs accepted their jobs back. Sutfin questioned whether it might be uncomfortable working with*

*Pearce since Mahoney was his friend. Stewart replied that he personally would run the grader if Pearce gave them any problems. Stewart also told them that they should come to him directly if they had any problems.* He also stated that he did not consider moving a few signs to be a real problem, a reference to the incident that had generated the blow-up in the first place.

"35.   That same evening Pearce notified Mahoney that he was terminated. Stewart told Pearce that the plaintiffs had been reinstated and *directed him to stay away from them on the job.*

"36.   Prior to August 10, 1989, plaintiffs made no complaint whatsoever to Robert Stewart, Marilyn Stewart or James McClung [all principles or officers of KP]. They consistently reported to those persons that job conditions were fine." (Emphasis supplied.)

In the days following, plaintiffs returned to work and were supervised by Mike Voight. There is no evidence that the sexual banter that had been the daily fare of the dirt crew continued under the new supervisor. Even if a hostile work environment had existed insofar as plaintiffs were concerned, that was no longer the situation after August 10. On August 15, Mahoney met with Stewart and told Stewart that plaintiffs were complaining about conduct that they had participated in themselves. He asserted that it was unfair to fire him under those circumstances. Stewart also learned that Mahoney had apologized to the county employee. Stewart decided to reinstate Mahoney, but assigned him to work with Pearce at a work site that was five or six miles away from where plaintiffs were working and being supervised by Voight. The trial court found, "Stewart did not believe there would be any contact between the plaintiffs and Mahoney on the job due to the geographical distance and the topography of the working area."

Mahoney returned to work. It is what happened next on August 16, 1989, that led the trial court to conclude that although plaintiffs had worked in a sexually hostile environment before August 10, they were not entitled to lost wages incurred after August 16. The trial court found:

"64.   On the morning of August 16, 1989, Ballinger had just arrived at the work site, but was not yet working. She saw Pearce drive by with Mahoney in his truck. *No words or*

*gestures were exchanged.* Ballinger assumed that Mahoney had been rehired. She went to talk to Sutfin, and the two decided to leave work. *Sutfin did not see Mahoney.*

"65.   The crew to which Mahoney had been assigned was involved in fine grading * * *. Pearce and Mahoney's crew was following Voight's crew (separated by a distance of five to six miles) moving in the same direction. The two crews would not have converged. Given the pace of the work, Pearce and Mahoney would have fallen even further behind Voight and the plaintiffs.

"66.   Plaintiffs advised Voight they were leaving. *He tried to convince them to stay on the job, or at least to talk to Robert Stewart and to give the company a chance. They responded that they would not talk to anybody and walked off the job. While Voight hoped they would return, plaintiffs left declaring they had no intent to talk to Stewart.*

"* * * * *

"76.   Stewart did not intend for any of the events to cause harm or injury, *nor did he intend for the plaintiffs to quit their employment.*

"77.   Neither Defendant Klamath Pacific nor Defendant Robert Stewart intended that plaintiffs be discharged on August 16, 1989, nor did *either defendant create working conditions with the intent that either plaintiff be forced to terminate her employment.*" (Emphasis supplied.)

## PLAINTIFFS' LEGAL THEORIES AND THE APPLICABLE LAW

Plaintiffs' unlawful employment practice claims are brought under ORS 659.030. ORS 659.121 provides the remedies for a violation of ORS 659.030. In 1977, the legislature enacted ORS 659.121 because the House Labor Committee was unhappy about the delay and backlog that had accrued in the handling of discrimination complaints by the Bureau of Labor and Industries, a state agency. *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 92, 689 P2d 1292 (1984). During the consideration of the bill, a disagreement arose between the Attorney General's office and the Bureau of Labor on the issue of remedies. The Attorney General argued that the statutory remedies for private causes of action should be consistent with federal Title VII remedies. The Labor Commissioner urged that the remedies be consistent

with those available under the existing administrative process. As finally enacted, ORS 659.121(1) was intended to parallel federal Title VII remedies. The legislature did not intend to provide for the recovery of compensatory damages under ORS 659.030 and the relief for violations of that statute were limited to equitable relief including "back pay." *Id.* at 99.

In this case, the majority on *de novo* review finds a violation of ORS 659.030(1)(b) and rules, "* * * [the trial court erred when it] barred recovery of lost wages on that basis [the reasonable effort requirement]" and "[o]n remand, plaintiffs may obtain equitable relief under ORS 659.121." 135 Or App at 450. The majority makes the following errors in its analysis. (1) The majority errs in ordering a remand; (2) the majority errs in analyzing plaintiffs' claims under ORS 659.030(1)(b); (3) the evidence does not establish a wrongful discharge under ORS 659.030(1)(a); (4) even if plaintiffs' have demonstrated a violation of ORS 659.030-(1)(b), the trial court was correct in denying them "equitable relief."

ORS 659.022(3) says,

"The purpose of ORS 659.010 to 659.110 * * * is to encourage the fullest utilization of available manpower by removing arbitrary standards of race, religion, color, sex, marital status, national origin or age as a barrier to employment of the inhabitants of this state; to insure human dignity of all people within this state, and protect their health, safety and morals from the consequences of intergroup hostility, tensions and practices of discrimination of any kind based on race, religion, color, sex, marital status or national origin. To accomplish this purpose the Legislative Assembly intends by [ORS 659.030] to provide:

"(1)   A program of public education calculated to eliminate attitudes upon which practices of discrimination because of * * * sex are based.

"(2)   An adequate remedy for persons aggrieved by certain acts of discrimination because of * * * sex * * *.

"(3)   An adequate administrative machinery for the orderly resolution of complaints of discrimination through a procedure involving investigation, conference, *conciliation and persuasion*; *to encourage* the use in good faith of such machinery *by all parties* to a complaint of discrimination;

and to discourage *unilateral* action which makes moot the outcome of final administrative or judicial determination on the merits of such a complaint.'' (Emphasis supplied.)

ORS 659.121(1) provides, in part:

"Any person claiming to be aggrieved by alleged violations of * * * ORS 659.030 may file a civil suit in circuit court for injunctive relief, and the court may order such other *equitable relief* as may be appropriate, including but not limited to reinstatement or the hiring of employees with or without back pay * * *.'' (Emphasis supplied.)

ORS 659.030(1)(a) and (b) define, in part, what constitute in part "an unlawful employment practice'' in Oregon. They provide, in relevant part:

"(1) * * * it is an unlawful employment practice:

"(a) For an employer, because of an individual's * * * sex, * * * to refuse to hire or employ or to bar or discharge from employment such individual. * * *

"(b) For an employer, because of an individual's * * * sex, * * * to discriminate against such individual in compensation, terms, conditions or privileges of employment.''

Subsections (a) and (b) are discrete statutes, the violation of which gives rise to the remedies under ORS 659.121(1). Subsection (a) makes a wrongful discharge an unlawful employment practice. Subsection (b) makes a hostile work environment an unlawful employment practice.

(1) The majority errs by remanding to the trial court for an award of equitable relief.

The majority's disposition is perplexing. In their complaints, plaintiffs purport to allege violations of ORS 659.030(a) and (b) and as a result, claim entitlement to lost wages in the amount of $79,627 together with interest thereon and attorney fees. Plaintiffs do not seek equitable relief such as reinstatement of their employment or some kind of injunctive relief. In light of our *de novo* review of equitable claims under ORS 19.125(3), it is unclear to me what relief the majority expects the trial court to award and why with the entire record before it, the majority does not undertake to award the equitable relief to plaintiffs that it believes they deserve.

(2) Plaintiffs did not allege or prove claims under ORS 659.030(1)(b).

The majority's analysis under ORS 659.030(1)(b) is erroneous because of a combination of two factors. First, plaintiffs do not seek any relief other than an award of wages for a two-year period beginning with August 16, 1989, the date that they consider to be their constructive discharge by KP. Second, the facts that they rely on as the basis for their claims demonstrate that their claims could not be under ORS 659.030(1)(b). Consequently, their claims are under ORS 659.030(1)(a) by operation of law rather than ORS 659.030-(1)(b) as the majority claims.

In their prayers for relief, plaintiffs do not seek reinstatement of their employment or a court-ordered increase in back pay for discrimination that arose out of the "terms, conditions or privileges of employment" before August 10 and during the time that they were employed. An employer's violation of ORS 659.030(1)(a) and ORS 659.030(1)(b) could result in alternative claims for a "back pay" award for the period of time during which the employee was employed and for the period after he or she was discharged, but that is not the gist of plaintiffs' claims. They seek only damages for lost wages for a period of time after August 16 or the day they walked off the job.

Although plaintiffs allege what they describe as "(Oregon civil rights violations under ORS chapter 659)," we do not assess the nature of legal theories based on their labels in pleadings, but on the operative facts that are pled. ORCP 18 A. *Hawkins v. City of La Grande*, 315 Or 57, 843 P2d 400 (1992). In the first eight paragraphs, plaintiffs describe how they were hired as traffic control persons, and the discriminatory conduct by Pearce and Mahoney that occurred before August 10, 1989. They allege that, as a result, "Klamath Pacific created a hostile and offensive working environment." The next three paragraphs allege the events that occurred on August 10. Thereafter, they allege specifically:

"12.

"*Upon returning to the employment of Klamath Pacific on August 11, 1989, and continuing through August 16, 1989, [plaintiffs] were subjected to further harassment and a hostile work environment* in one or more of the following ways:

"'* * * * *

"13.

"Stewart failed to take prompt or effective remedial measures to protect [plaintiffs] from further harassment on the job at Klamath Pacific. Instead, Stewart placed [plaintiffs] back into a known hostile work environment under the supervision of Pearce.

"'* * * * *

"17.

"*Klamath Pacific and Stewart intentionally and deliberately placed [plaintiffs] into a known hostile work environment, and all Defendants subjected [plaintiffs] to intolerable working conditions with the intention of forcing [them] to terminate [their] employment with Klamath Pacific.* [Plaintiffs'] forced resignation was wrongful, tortious, and retaliatory in that [plaintiffs], as [employees] of Klamath Pacific, [were] forced to resign for pursuing the important employee-related right to resist sexual discrimination in the form of harassment and discrimination by [their] supervisors.

"18.

"The above acts and omissions by Defendants amounted to discrimination against [plaintiffs] on the basis of [their] sex, and affected the terms, conditions or privileges of [their] employment with Klamath Pacific in violation of ORS 659.030(a) and (b).

"19.

"As a result of the above acts and omissions by Defendants, [plaintiffs are] entitled to recover lost wages * * *, and * * * reasonable attorney fees and costs incurred herein pursuant to ORS 659.121(1)." (Emphasis supplied.)

The two most salient allegations that express the gravamen on which plaintiffs' claims are based are found in paragraph 12 and 17. In paragraph 12, they allege that when they returned to work on August 11 and through August 16, they were subjected to "further harassment and a hostile work environment." In paragraph 17, they claim that they were forced to quit on August 16, because KP and Stewart "intentionally and deliberately" placed them into a known hostile work environment and that all defendants subjected them to "intolerable working conditions" with the intention

of forcing them to terminate their employment. In other words, plaintiffs contend in their pleadings that they were forced to quit because a hostile work environment existed after KP reinstated Mahoney and that is also the gravamen of their evidence. There is no evidence that plaintiffs were sexually harassed after August 10. Having made no complaints to Stewart about sexual harassment by Pearce before August 10 and having agreed to return to work after that date, their pleadings and evidence confine the theory of their claims to the legal effect of the reinstatement of Mahoney. It was that act that triggered the quitting of their employment and their contention that they had been constructively discharged. Accordingly, their claims necessarily are under only ORS 659.030(1)(a), and they have requested no cognizable relief for a violation of ORS 659.030(1)(b).

(3) Plaintiffs are not entitled to prevail under ORS 659.030(1)(a).

In *Bratcher v. Sky Chefs, Inc.*, 308 Or 501, 783 P2d 4 (1989), the Supreme Court set forth the elements required to prove a wrongful constructive discharge under ORS 659.030(1)(a). The court said,

"In sum, to establish a constructive discharge stemming from unacceptable working conditions, a plaintiff must prove (1) that the employer deliberately created or deliberately maintained the working conditions(s) (2) with the intention of forcing the employee to leave the employment, and (3) that the employee left the employment because of the working conditions." 308 Or at 506.

It is apparent from the trial court's findings and to me on *de novo* review that it was not the sexual banter or touching of plaintiffs by Mahoney and Pearce before August 10 that induced plaintiffs to quit. There are several circumstances that support that inference, including the fact that plaintiffs did not complain about sexual harassment until they were fired for insubordination. After all, according to plaintiffs, the discrimination had been ongoing and pervasive for two construction seasons. Second, plaintiffs made no effort to have Pearce disciplined or fired even though they claimed he had perpetuated the harassment along with Mahoney. The more reasonable inference to draw from all the evidence is that plaintiffs did not consider the conduct of

Mahoney and Pearce to be objectionable personally until they were faced with their own dismissal for being insubordinate and argumentative with their supervisor. Moreover, there are other circumstances that lead to the same inference.

In their discussion with Stewart on August 10, the complaint about sexual harassment arose only after plaintiffs complained about the amount of wages that they were receiving and about being required to move the signs with Sutfin's private vehicle. Specifically, the trial court found that "plaintiffs complained in general terms about Mahoney's alleged sexual misconduct on the job." Initially, Stewart did not believe their allegations because of the manner in which they were presented including the fact that he detected an odor of alcohol from one of the plaintiffs.[2] Then at a later point, plaintiffs brought up the statement made by Mahoney about the county employee's daughter. Stewart testified that he thought,

> "their [plaintiffs'] natural reaction is going to be to tell — blame everybody but themselves. But now I got somebody I can call. I can verify this one. Okay? And maybe these girls are telling me the truth. At this point, I don't know. Okay?"

---

[2] Stewart testified,

"When they first came, they came into the office, and they were both talking at the same time, and I think probably one of them was talking about one subject, the other one talking about another subject; but what they were trying to tell me was that we had a problem out there with the — Kevin especially, that — his name came up a lot. But I'm dealing with two employees that just lost their jobs, and they come into my office; and this is not uncommon, when an employee is fired, to come in and blame everybody but themselves for what they did or didn't do.

"* * * * *

"Well, I was kind of staying open-minded at this point. I don't want to jump to any conclusions, so I'm sitting back, and I'm listening. And then pretty much generally, they said a lot of things about Kevin and how he talked dirty and filthy, and this is the first I knew about this sort of thing."

When questioned about what his understanding was of the tenor of plaintiffs' complaints, Stewart testified that he thought that the thrust of plaintiffs' statements were, "If I'm going to be fired, by gosh, you're going to fire him, too." Stewart was asked if it was his sense that plaintiffs were complaining about specific incidents of sexual harassment directed at them. He replied,

"Well, I don't know if it was — could be, at that time, could be considered sexual harassment. I think they were making — telling me the remarks that Kevin had said in general, not in particular."

Ballinger and Sutfin left the office at Stewart's request to procure their radios and to return them. After he made a telephone call and confirmed the fact that Mahoney had made an offensive comment to a county employee, Stewart testified that "for the first time in our conversation, I'm dealing with something I know is real." Stewart ordered Pearce to fire Mahoney. When plaintiffs came back to the office with the radios, Stewart asked them if they would like their jobs back. They said, "Well, we won't work with Kevin [Mahoney]." Stewart replied, "You don't have to work with Kevin. Don't worry about that; but you're going to work with Mike [Voight]." Stewart testified that prior to that time, plaintiffs had not complained about Pearce's conduct. Plaintiffs readily agreed to return to work with the understanding they would still have contact with Pearce. Although the majority emphasizes that Pearce was a co-actor with Mahoney in perpetrating the alleged harassment, it is noteworthy that plaintiffs did not express concern to Stewart about further sexual discrimination from Pearce, but only that it might be "uncomfortable" working with him because he was Mahoney's friend. Stewart assured plaintiffs that if there were any problems with Pearce, he would run the grader personally and they should come to him "directly." Later, plaintiffs had contact with Pearce at work, but they made no complaint to Stewart. The obvious implication of these facts is that what had occurred in the past was not significant enough to plaintiffs to deter them from resuming their employment so long as they had no contact with Mahoney and the record is uncontradicted that after August 10, plaintiffs had no contact with Mahoney on the work site.

The evidence also shows that KP had eliminated any potential of a hostile work environment after August 10 by assigning plaintiffs to work at a work site six miles away from Pearce and Mahoney under a different supervisor, Voight. Moreover, there is no evidence of any sexual harassment of plaintiffs between August 10 and 16 as alleged. Although Pearce and Mahoney's contact with Sutfin after August 10 may be actionable under other claims, those contacts were not in the nature of sexual harassment. Pearce made statements intended to induce Sutfin to withdraw her allegations of sexual harassment, and Mahoney threatened to commit

suicide, but those actions do not constitute sexual harassment, nor are they evidence that Pearce intended to force plaintiffs to quit after Mahoney was reinstated.[3] The only event that happened within the time period alleged by plaintiffs attributable to the direct actions of KP is the reinstatement of Mahoney.

There is *no* evidence that Stewart acted with the intent to force plaintiffs to quit when he reinstated Mahoney. The only evidence is that he thought Mahoney to have been a good employee in the past and that he desired to reemploy him in a work site apart from where plaintiffs worked. That evidence does not demonstrate that KP and Stewart intended to force plaintiffs to quit. The answer to plaintiffs' claims under ORS 659.030 and to Ballinger's claim of common law wrongful discharge is that they did not prove what they alleged; that KP and Stewart deliberately placed them into a known hostile work environment with the intention of forcing them to terminate their employment with KP.

(4)   Even if plaintiffs' claims are considered under ORS 659.030(1)(b), they have not demonstrated an entitlement to "back pay" or other "equitable relief."

The majority has failed to differentiate between proof of liability under ORS 659.030 and entitlement to relief under ORS 659.121 when analyzing the trial court's decision. For the reasons mentioned, I disagree with the trial court's conclusions about the legal import of plaintiffs' allegations and their evidence. Nevertheless, if, in fact, a violation of ORS 659.030(1)(b) occurred before August 10 independent of a wrongful discharge and plaintiffs were discriminated against in the "terms, conditions, and privileges of their employment," they have not demonstrated an entitlement to back pay or other equitable relief for that discrimination.

A discriminating employer is liable under Title VII when the discrimination is "sufficiently severe or pervasive to alter the conditions of [the victims'] employment and [to] create an abusive working environment." *Meritor Savings*

---

[3] Pearce's and Mahoney's contact with Sutfin on August 11 was unknown to and unauthorized by KP. The trial court found that Pearce made the threats on August 11 to protect his own employment, to help Mahoney and to help KP avoid liability for what had occurred previous to August 11.

*Bank v. Vinson*, 477 US 57, 67, 106 S Ct 2399, 91 L Ed 2d 49 (1986). *See also Mains v. II Morrow, Inc.*, 128 Or App 625, 877 P2d 88 (1994). Under federal law, KP would be liable if after it knew or should have known of the abusive work environment, it failed to prevent the discrimination or take prompt and corrective action against it. *See, e.g., Steele v. Offshore Shipbuilding, Inc.*, 867 F2d 1311 (11th Cir), *reh'g den* 874 F2d 821 (1989). Moreover, prompt remedial action upon being notified of the discrimination relieves an employer of liability for damages. For instance, in *Barrett v. Omaha National Bank*, 726 F2d 424 (8th Cir 1984), the employer avoided liability when it immediately investigated claims by employees of harassing conduct and reprimanded the offenders within four days of the report, informed them that their conduct would not be tolerated, and told one harasser that he would be fired for any further misconduct. Similarly, in *Dornhecker v. Malibu Grand Prix Corp.*, 828 F2d 307, 309 (5th Cir 1987), the court held that the employer's remedial action was adequate when the employer told the complainant that the sexual harasser would only work with her one and one-half more days.

Here, the majority holds that consideration of whether an employee made a reasonable effort to resolve the conflict with the employer about sexual harassment within the work place before filing a lawsuit is improper under ORS 659.030(1)(b) even though the statute was intended by the legislature to track Title VII. Moreover, the majority's holding ignores the language of ORS 659.121. The legislature has expressly authorized courts to award only "equitable remedies" for a violation of ORS 659.030(1). An "equitable remedy" always includes a consideration of the conduct of the injured party in light of the policy of the law. For instance, the invocation of the "clean hands" doctrine as an equitable maxim is based on conscience and good faith, not necessarily as a defense, but for the protection of public policy and the integrity of the court. *Taylor et ux v. Grant et al*, 204 Or 10, 24, 279 P2d 1037, 281 P2d 704 (1955). In light of the language of the statute, it can hardly be said that the legislature did not intend for courts to consider the conduct of plaintiffs in deciding whether to award relief for an unlawful employment practice.

At the heart of the majority's remand is the belief that the trial court erred when it cited to *Thorne v. City of El Segundo*, 726 F2d 459 (9th Cir 1983), *cert den* 469 US 979 (1984), as a basis for denying plaintiffs back pay even though it found a violation of ORS 659.030(1)(b). In *Thorne*, the court noted that the primary objective of Title VII is to "eliminate all vestiges of discrimination in the work place and to make persons whole who have suffered unlawful discrimination." 802 F2d at 1133 *citing Albermarle Paper Company v. Moody*, 422 US 405, 417, 95 S Ct 2362, 45 L Ed 2d 280 (1975). It held that Title VII *remedies* must be exercised in light of that objective, and that back pay should be awarded only in furtherance of that purpose. It said:

> "An employee faced with an obstacle in the legal progression and development of a career should not quit at the first sign of institutional discrimination. Restricting back pay awards encourages the employee to work with supervisors within the existing job setting and employment relationship in an effort to overcome resistance within *that* work place and to eradicate the discrimination." 802 F2d at 1134. (Emphasis supplied.)[4]

*See also Watson v. Nationwide Ins. Co.*, 823 F2d 360 (9th Cir 1987). The trial court did not err when it relied on the policy expressed in *Thorne* to deny an award of back pay to plaintiffs.

Also, the majority says that requiring an employee to make reasonable efforts to resolve the conflict within the work place to be entitled to back pay conflicts with the court's opinion in *Bratcher*. The majority confuses the standard for awarding equitable relief under ORS 659.121 with the elements of liability for a wrongful discharge under ORS 659.030(1)(a).[5] There is nothing in the language of ORS

---

[4] In *Thorne*, the plaintiff voluntarily resigned from her clerk-typist position with the City of El Segundo police department after she applied unsuccessfully for a position as a police officer with the city. The court said that the doctrine of constructive discharge was inapplicable because the city's actions were in the nature of a refusal to hire Thorne. However, it said that had this been a constructive discharge case, it would have applied the rule of *Satterwhite v. Smith*, 744 F2d 1380 (9th Cir 1984).

[5] The majority asserts that the consideration of plaintiffs' conduct in determining what is an equitable remedy is inconsistent with the court's rejection in *Bratcher* of the argument that the employee must show that a reasonable person in the employee's position would consider the working conditions so unacceptable as to force a resignation. 135 Or App at 448. In fact, the court in *Bratcher* said:

659.030 or ORS 659.121 that prevents the consideration of an employee's conduct in determining an equitable award. Moreover, the policies described in ORS 659.022 imply to the contrary.

The majority also reasons that under the circumstances, "a reasonable person could have concluded that *there was no use in taking further action.*" 135 Or App at 450. (Emphasis in original.) Sutfin concedes that she and Ballinger had talked to Stewart "extensively about the situation" and "he told us if we had a problem — more problems on the job, come and talk to him." Voight encouraged plaintiffs to talk with Stewart before they walked off the job. Nonetheless, they refused. Perhaps when plaintiffs saw Mahoney riding in the truck, they realized that they would be confronted by his wrath from causing him to be fired. Perhaps, they were mindful of his recent threat to commit suicide as a result of his being fired. Whatever their motivation in quitting was, there is no persuasive evidence that they walked off the job because of KP's unwillingness to confront the issue of discrimination. In light of that evidence, the trial court did not err in refusing to award equitable relief to plaintiffs.

Even if a violation of ORS 659.030(1)(b) occurred, plaintiffs have suffered no damages in the form of "back pay," the relief sought. As a remedy under Title VII, "back pay" is computed from the date of the discrimination until the date of the final judgment. When a plaintiff seeks "back pay" as a remedy, that person has an affirmative duty to mitigate damages by exercising "reasonable diligence" in finding other "substantially equivalent" employment. *Ford Motor Co. v. EEOC*, 458 US 219, 102 S Ct 3057, 73 L Ed 2d 721 (1982). ORS 659.121(1) further qualifies the remedy by

"We emphasized above that, underlying a discharge, direct or constructive, is a dismissal stemming from the employer's intent to be rid of a specific employee or employees. We have imposed a substantial burden of proof on the employee, *requiring proof of the employer's subjective intention.* If the employee must prove that the employer deliberately created or maintained working conditions known to be unacceptable with the purpose of forcing the employee to leave, and if the employee proves that this was the actual reason why the employee did leave when otherwise the employee would have remained, it is immaterial what some other hypothetical employee would have done; on those facts, the employer will have achieved the employer's purpose to terminate the employment relationship." 308 Or at 506. (Footnote omitted.)

providing that, "[b]ack pay liability shall not accrue from a date more than two years * * * prior to the filing of the civil suit."

In this case, plaintiffs quit in August 1989, and they filed their complaints in August 1990, after they worked as flaggers for other employers. The trial court found:

> "After plaintiffs left Klamath Pacific, *they both worked as flaggers in the summer of 1990.* Kay Ballinger quit her employment to join her husband in Alaska. She was aware there were only limited job opportunities in Alaska and disregarded advice from her husband's employer that she delay her move. She took a job in a pizza parlor and thereafter, ceased looking for other work. Ballinger now permanently resides in Alaska. Sutfin voluntarily quit her employment with White in 1990 and has not made any attempt to find alternative employment. Sutfin has an emotional condition which affects her employment as a flagger. She has not sought non-flagging positions since leaving employment with White." (Emphasis supplied.)

In light of the above facts, plaintiffs have suffered no loss of back pay caused by KP's conduct.

It was merely fortuitous that on August 16 Ballinger saw Mahoney and Pearce riding in a pickup together going to a different work site. That fortuity does not give rise to liability under either ORS 659.030(1)(a) or (b) nor was KP's remedy inadequate when it learned of what had occurred before August 10. Finally, the trial court did not err as a matter of equity when it denied plaintiffs back pay for a period of time that they never worked. There is no relief which plaintiffs seek that is available to them under the facts of this case. Under Title VII, the federal courts seek to encourage where possible that discrimination in the work place be attacked by maintaining the existing employer-employee relationship. We should follow their policy. Eradication of discrimination in the work place has its greatest potential of success when employers and employees work together. When employees file and recover on lawsuits before they have exhausted the potential remedial action, they frustrate the purpose of statutes like ORS 659.030. The majority's myopic analysis does just that. In effect, it holds KP strictly liable for discrimination that occurred without its

knowledge when in fact the discrimination could have been remedied in the work place had KP been given that opportunity. In sum, the majority's result on plaintiffs' unlawful employment practice claims and Ballinger's common law discharge claim is unjust.

Otherwise, I agree with the majority regarding the analysis of plaintiffs' other assignments of error and defendants' assignments of error on cross-appeal.